**Baker & Hostetler LLP**
45 Rockefeller Plaza
New York, NY 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com

*Of Counsel:*
John W. Moscow
Email: jmoscow@bakerlaw.com
Oren J. Warshavsky
Email: owarshavsky@bakerlaw.com

*Attorneys for Irving H. Picard,*
*Trustee for the SIPA Liquidation of*
*Bernard L. Madoff Investment Securities LLC*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>BERNARD L. MADOFF INVESTMENT SECURITIES LLC,<br><br>        Debtor. | SIPA LIQUIDATION<br><br>No. 08-01789 (BRL) |
| IRVING H. PICARD, Trustee for the Liquidation of Bernard L. Madoff Investment Securities LLC,<br><br>        Plaintiff,<br><br>        v.<br><br>COHMAD SECURITIES CORPORATION, MAURICE J. COHN, MARCIA B. COHN, ROBERT JAFFE, ALVIN J. DELAIRE, JR., STANLEY MERVIN BERMAN, JONATHAN GREENBERG, CYRIL JALON, MORTON KURZROK, LINDA SCHOENHEIMER MCCURDY, RICHARD SPRING, ROSALIE BUCCELLATO, MILTON S. COHN, MARILYN | Adv. Pro. No. _____ (BRL) |

COHN, JANE M. DELAIRE A/K/A JANE
DELAIRE HACKETT, CAROLE DELAIRE,
EDWARD H KOHLSCHREIBER, EDWARD H
KOHLSCHREIBER SR REV MGT TRUST,
GLORIA KURZROK, JOYCE BERMAN, S & J
PARTNERSHIP, JANET JAFFIN REVOCABLE
TRUST, THE SPRING FAMILY TRUST,
JEANNE T. SPRING TRUST, THE ESTATE OF
ELENA JALON, THE JOINT TENANCY OF
PHYLLIS GUENZBURGER AND FABIAN
GUENZBURGER, THE JOINT TENANCY OF
ROBERT PINCHOU AND FABIAN
GUENZBURGER, ELIZABETH M. MOODY

Defendants.

## COMPLAINT

Irving H. Picard, Esq. (the "Trustee"), as trustee for the liquidation of the business of Bernard L. Madoff Investment Securities LLC ("BLMIS"), under the Securities Investor Protection Act, 15 U.S.C. §§ 78aaa, et seq. ("SIPA"), by and through his undersigned counsel, for his Complaint against Cohmad Securities Corporation ("Cohmad"), Maurice "Sonny" J. Cohn, Marcia B. Cohn, Robert Jaffe, Alvin "Sonny" Delaire, Jr., Milton S. Cohn, Frank A. Christensen, Stanley Berman, Jonathan Greenberg, Cyril Jalon, Morton Kurzrok, Linda McCurdy, Richard Spring, Rosalie Buccellato, Marilyn Cohn, Jane M. Delaire a/k/a Jane Delaire Hackett, Carole Delaire, Gloria Kurzrok, Joyce Berman, S & J Partnership, Janet Jaffin Revocable Trust, The Spring Family Trust, Jeanne T. Spring Trust, The Estate of Elena Jalon, The Joint Tenancy of Phyllis Guenzburger and Fabian Guenzburger, The Joint Tenancy of Robert Pinchou and Fabian Guenzburger and Elizabeth M. Moody (collectively, "Defendants") states as follows:

## Summary Of The Action

1.    This complaint arises from certain Defendants' participation in and aiding of the massive Ponzi scheme perpetrated by Bernard L. Madoff ("Madoff") and BLMIS, as well as Defendants' receipt of avoidable transfers from BLMIS.  As detailed herein, the relationship between Cohmad and BLMIS was a symbiotic one, stretching back decades.  Despite the fact that they were ostensibly separate companies, the connections between Cohmad and BLMIS were so pervasive that they acted in many respects as interconnected arms of the same enterprise. Cohmad, whose employees both functioned and were compensated as though they were BLMIS representatives, was founded by Madoff and his friend and former neighbor, Maurice "Sonny" Cohn.  Cohmad - a name fashioned out of the first three letters of the names "Cohn" and "Madoff" - had its New York offices entirely within BLMIS' premises and even utilized BLMIS' employees and computer network.  Cohmad's primary business was directed towards helping BLMIS recruit an ever-expanding list of high-net-worth clients into the Ponzi scheme, and ultimately Cohmad and its registered representatives diverted several billion dollars to Madoff.

2.    The close, familial relationships between Madoff and the principals of Cohmad were such that Sonny and Marcia Cohn (Sonny's daughter) were part of Madoff's inner circle, and had that close affinity for many years.  As such, and also because of the physical proximity of its office, Cohmad had unique access to the secretive investment advisory ("IA") "business" of BLMIS through which Madoff's fraud was perpetrated.  Moreover, Cohmad's principals and employees had strong financial incentives to participate in, to perpetuate and to keep quiet about Madoff's fraudulent scheme.  Each of the Defendants knew or had access to the facts detailed herein.

3.     Cohmad's solicitations for BLMIS were successful – approximately twenty percent (20%) of active BLMIS accounts were referred by Cohmad representatives.  Indeed, Cohmad had little other business or purpose, apart from steering customers to BLMIS.  For over two decades, Cohmad funneled investors' money into customer accounts at BLMIS ("IA Accounts").  As a result, as much as 90% of Cohmad's reported income resulted from the continual referral of victims to BLMIS – and even more income was generated as a result of Cohmad's intimate relationship with BLMIS.  Defendants collectively profited from the Madoff Ponzi scheme to the tune of several hundred million dollars, through conduct that they knew or should have known was inconsistent with legitimate or credible securities or broker-dealer business activities.

4.     On March 12, 2009, Madoff admitted the fraudulent nature of his long-running scheme and pled guilty to 11 felony counts.  As a result of their intimate and lengthy relationship with Madoff and BLMIS, and participation and contribution to this fraudulent scheme, Defendants realized a very lucrative and illegal windfall, securing income for themselves based on each victim they introduced and added to the massive fraud.  That substantial windfall was made up of many avoidable transfers from BLMIS.  The purpose of this proceeding is to recover all those avoidable transfers and preferences received by the Defendants and return those ill-gotten gains to the victims of Madoff's long-running fraudulent scheme.

**Jurisdiction and Venue**

5.     This adversary proceeding is brought pursuant to 15 U.S.C. §§78fff(b) and 78fff-2(c)(3) and 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code"), the New York Fraudulent Conveyance Act (N.Y. Debt & Cred. §270 et seq. (McKinney 2001)) and other applicable law, for turnover, accounting, preferences, fraudulent conveyances, and damages in connection with

transfers of certain property by BLMIS to or for the benefit of Defendants. The Trustee seeks to set aside such transfers and preserve the property for the benefit of all of BLMIS' defrauded customers.

6.       This is an adversary proceeding brought in this Court, where the main underlying SIPA case, No. 08-01789 (BRL) (the "SIPA Case"), is pending. The SIPA Case was originally brought in the United States District Court for the Southern District of New York (the "District Court") as *Securities Exchange Commission vs. Bernard L. Madoff Investment Securities LLC et al.*, No. 08 CV 10791 (the "District Court Proceeding") on December 11, 2008 (the "Filing Date"), and was thereafter removed to this Court. This Court has jurisdiction over this adversary proceeding under 28 U.S.C. § 1334(b) and 15 U.S.C. §§78eee(b)(2)(A), (b)(4).

7.       This is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A), (F), (H) and (O).

8.       Venue in this district is proper under 28 U.S.C. § 1409.

## Cohmad and Its Registered Representatives

9.       Upon information and belief, defendant Cohmad is a corporation, organized and existing under the laws of the State of New York, with a principal place of business at 885 Third Avenue, New York, New York 10022. All brokerage firms and individuals involved in the sale of securities must be registered with the United States Securities and Exchange Commission ("SEC"), and also be a member of the National Association of Securities Dealers ("NASD"), now The Financial Industry Regulatory Authority ("FINRA"). Cohmad is registered with the SEC and currently is a FINRA member. Cohmad was assigned Central Registration Depository ("CRD") number 16307.

10. Upon information and belief, defendant Maurice "Sonny" Cohn ("Sonny Cohn") is a citizen of the State of New York and resides at 54 Elderfields Road, Manhasset, New York 11030. Maurice Cohn is registered as an agent of Cohmad, with CRD number 1313085. Upon information and belief, Maurice Cohn is an owner of Cohmad and serves as the Chairman and Chief Executive Officer of Cohmad.

11. Upon information and belief, defendant Marcia Beth Cohn ("Marcia Cohn"), Sonny Cohn's daughter, is a citizen of the State of New York and resides at 50 Sutton Place South Apt. 8E, New York, New York 10022. Marcia Cohn is registered as an agent of Cohmad, with CRD number 1049032. Upon information and belief, Marcia Cohn is an owner of Cohmad and serves as President, Chief Operating Officer, and Chief Compliance Officer of Cohmad.

12. Upon information and belief, defendant Robert Martin Jaffe ("Jaffe") is a citizen of the State of Florida and resides at 444 North Lake Way, Palm Beach, Florida 33480-3633. Jaffe is registered as an agent of Cohmad, with CRD number 256838. Upon information and belief, Jaffe is an owner of Cohmad and serves in the position of Vice President of Cohmad.

13. Upon information and belief, defendant Alvin James "Sonny" Delaire, Jr. ("Delaire") is a citizen of the State of Florida and resides at 3360 South Ocean Blvd., Apt. 2GS, Palm Beach, Florida 33480. Until February 2009, Delaire was registered as an agent of Cohmad, with CRD number 1480468.

14. Upon information and belief, defendant Stanley Mervin Berman ("Berman") is a citizen of the State of New York and resides at 20 E. 74th Street, Apt. 16B, New York, New York 10021. Until June 2007, Berman was registered as an agent of Cohmad, with CRD number 1376787.

15.     Upon information and belief, defendant Jonathan Barney Greenberg ("Greenberg") is a citizen of the State of Connecticut and resides at 40 Ettl Lane, #4, Greenwich, Connecticut 06831-4160.  Until January 2009, Greenberg was registered as an agent of Cohmad, with CRD number 850655.

16.     Upon information and belief, defendant Cyril David Jalon ("Jalon") is a citizen of the State of New York and resides at 549 Walton Avenue, Mamaroneck, New York 10543-4433. Jalon is registered as an agent of Cohmad, with CRD number 256951.

17.     Upon information and belief, defendant Morton David Kurzrok ("Kurzrok") is a citizen of the State of Florida and resides at 17577 Scarsdale Way, Boca Raton, Florida 33496. Kurzrok is registered as an agent of Cohmad, with CRD number 1054934.

18.     Upon information and belief, defendant Linda Schoenheimer McCurdy ("Schoenheimer") is a citizen of the State of New York and resides at 19 Hudson Street, New York, New York 10013.  Schoenheimer is registered as an agent of Cohmad, with CRD number 2991967.

19.     Upon information and belief, defendant Richard George Spring ("Spring") is a citizen of the State of Florida and resides at 20572 Links Circle, Boca Raton, Florida 33434. Spring is registered as an agent of Cohmad, with CRD number 432604.

20.     Upon information and belief, defendant Rosalie Buccellato ("Buccellato") is a citizen of the State of New York and resides at 53 Belmont Avenue, Plainview, New York 11803.  Buccellato is registered as an agent of Cohmad, with CRD number 848124.  Upon information and belief, Buccellato is an owner of Cohmad and serves as a principal.

21.     Upon information and belief, defendant Milton S. Cohn ("Milton Cohn") is a citizen of the State of New York and resides at 36 Sunset Road, Kings Point, New York and also is Sonny Cohn's brother.  Upon information and belief, Milton Cohn is an owner of Cohmad and serves as a principal.

22.     Upon information and belief, Sonny Cohn, Marcia Cohn, Jaffe, Delaire, Berman, Greenberg, Jalon, Kurzrok, Schoenheimer, Spring, Buccellato and Milton Cohn (collectively, the "Cohmad Representatives") all knew that the activities that they undertook on behalf of Cohmad were for the benefit of BLMIS.

23.     Sonny Cohn, Marcia Cohn, Jaffe, Delaire, Berman, Greenberg, Jalon, Kurzrok, Spring and Milton Cohn all maintained accounts at BLMIS.

24.     Upon information and belief, Cohmad was used, at least in part, by the Cohmad Representatives for the purpose of furthering the BLMIS Ponzi Scheme.  Upon information and belief, Cohmad has been dominated and used as the instrument of Sonny Cohn, Marcia Cohn and Jaffe to advance their own personal interests rather than legitimate corporate ends.  Upon information and belief, Sonny Cohn, Marcia Cohn and Jaffe exercised complete domination and control of Cohmad in dealing with BLMIS, whose activities they knew or should have known were predicated on fraud.  As a result, Defendants Sonny Cohn, Marcia Cohn and Jaffe functioned as alter egos of Cohmad and no corporate veil can be maintained among them.

## Other Defendants

25.     Upon information and belief, defendant Marilyn Cohn is Sonny Cohn's wife and resides at 54 Elderfield Road, Manhasset, New York 11030. Marilyn Cohn was at one time the Vice President and Secretary of Cohmad. Marilyn Cohn maintained several accounts at BLMIS, including those bearing account numbers 1C1069, 1C1228, 1C1311, 1CM035, 1CM640 and 1ZA409.

26.     Upon information and belief, defendant Jane M. Delaire a/k/a Jane Delaire Hackett ("Hackett") is Delaire's sister, and resides in Watermill, New York. Hackett maintained at least two accounts at BLMIS, including those accounts bearing account numbers 1H0004 and 1H0095.

27.     Upon information and belief, defendant Carole Delaire is Delaire's wife, and maintained at least three accounts at BLMIS, including those bearing account numbers 1D0014, ID0015 and 1H0044 and had addresses reported as 5 Cowdray Park, Far Hills, New Jersey 07931 and 865 U.N. Plaza, APT# 11D, New York, New York 10017.

28.     Upon information and belief, defendant Edward H. Kohlschreiber is defendant Carole Delaire's father, and maintained at least three accounts at BLMIS, including those bearing account numbers 1K0040, 1K0074, 1K0113, 1K0102 and 1CM633 and had addresses reported as 108 Willever Way Stewartsville, New Jersey 8886, P O Box 173859 Denver, Colorado 80217 and 3546 S Ocean Blvd Apt #522 Palm Beach, Florida 33480.

29.     Upon information and belief, defendant Gloria Kurzrok is married to Kurzrok, and resides at 48 Remsen Road, Great Neck, New York, 11024. Gloria Kurzrock maintained at least one account at BLMIS, including the account bearing the number 1CM106, and had an address reported as 549 Walton Avenue, Mamaroneck, New York 10543.

30.     Upon information and belief, defendant Joyce Berman is married to Berman, and resides at 20 East 74th Street, Apartment 16-B, New York, New York, 10021. Joyce Berman maintained at least one account at BLMIS, including the account bearing the number 1CM024.

31.     Upon information and belief, defendant S & J Partnership is a partnership between Berman and Joyce Berman and has a principal place of business at 20 East 74th Street, Apartment 16-B, New York, New York, 10021. S & J Partnership maintained at least one account at BLMIS, including the account bearing the number 1CM025.

32.     Upon information and belief, defendant Janet Jaffin Revocable Trust (the "Jaffin Trust") is a trust established for the benefit of, among others, Greenberg, and maintains an address at 230 Park Avenue 10th Fl #16, New York, New York 10169.  The Jaffin Trust maintained at least one account with BLMIS, including the account bearing the number 1CM093.

33.     Upon information and belief, defendant The Spring Family Trust (the "Spring Trust") is a trust established for benefit of, among others, Spring, and for which Spring is the trustee, and maintains an address at 20572 Links Circle, Boca Raton, Florida 33434.  The Spring Trust maintained at least one account with BLMIS, including the account bearing the number 1S0193.

34.     Upon information and belief, defendant Jeanne T. Spring Trust (the "Jeanne Spring Trust") is a trust established for benefit of, among others, its trustee, Jeanne Spring, Spring's wife, and maintains an address at 20572 Links Circle, Boca Raton, Florida 33434. The Jeanne Spring Trust maintained at least one account with BLMIS, including the account bearing the number 1S0194.

35.     Upon information and belief, Jalon was married to Elena Jalon. Upon information and belief, Elena Jalon died on or about June 5, 2008. Upon information and belief, defendant The Estate Of Elena Jalon (the "Jalon Estate") is an Estate established under the laws of the State of New York. Upon information and belief, Jalon is the executor of the Jalon Estate. Upon information and belief, the Jalon Estate maintained at least one account at BLMIS, including the account bearing the number 1CM096, and had an address reported as 549 Walton Avenue, Mamaroneck, New York 10543.

36.     Upon information and belief, defendant The Joint Tenancy of Phyllis Guenzburger and Fabian Guenzburger (the "Guenzburger Tenancy") is a joint tenancy with the right of survivorship. The Guenzburger Tenancy maintained at least one account at BLMIS, including the account bearing the number 1FN019, and had an address reported as Amsel Strasse 18, Basel 4059, Switzerland. Upon information and belief, there were account transfers between the BLMIS account maintained for the estate of Elena Jalon, and the BLMIS account maintained for the Guenzburger Tenancy.

37.     Upon information and belief, defendant The Joint Tenancy of Robert Pinchou and Fabian Guenzburger (the "Pinchou Tenancy") is a joint tenancy with the right of survivorship.  The Pinchou Tenancy maintained at least one account at BLMIS, including the account bearing the number 1FN065, and had an address reported as Dornacherstrasse 16, 4147 Aesch, Switzerland.  Upon information and belief, there were account transfers between the BLMIS account maintained for the estate of Elena Jalon and the BLMIS account maintained for the Pinchou Tenancy.

38.     Upon information and belief, defendant Elizabeth M. Moody ("Moody") is an individual residing at 84 Curtis Place, Lynbrook, New York 11563.  Upon information and belief, Moody was an employee of Cohmad and maintained at least one account with BLMIS, including the account bearing the number 1CM133.

39.     Upon information and belief, the Cohmad Representatives directed and controlled the remaining Defendant entities and individuals with IA accounts at BLMIS listed in paragraphs 25 through 38 above (collectively, the "BLMIS Cohmad Family Accounts"),  even though the Cohmad Representatives knew or should have known that BLMIS was predicated on fraud.  Even if Defendants did not have knowledge of the fraudulent scheme, they received transfers of money from BLMIS for which they did not provide value.

### The Fraudulent Ponzi Scheme And Cohmad's Participation

40.     BLMIS is a New York limited liability company that is wholly owned by Madoff. Initially founded in 1959 as a private proprietorship, BLMIS operated from its principal place of business at 885 Third Avenue, New York, New York.  Madoff, as founder, chairman, and chief executive officer, ran BLMIS together with several Madoff family members and a number of

employees. BLMIS had three business units: investment advisory (the "IA Business"), market making, and proprietary trading.

41. On December 11, 2008, Madoff confessed that, through BLMIS, he had been conducting a Ponzi-scheme for many years and that he estimated BLMIS' liabilities to be $50 billion.

42. At a plea hearing (the "Plea Hearing") on March 12, 2009 in the case captioned *United States v. Madoff*, Case No. 09-CR-213(DC), Madoff pled guilty to an 11-count criminal information filed against him by the United States Attorneys' Office for the Southern District of New York. At the Plea Hearing, Madoff admitted that he "operated a Ponzi scheme through the investment advisory side of [BLMIS]." (Plea Hr'g Tr. at 23:14-17.) Additionally, Madoff asserted "[a]s I engaged in my fraud, I knew what I was doing [was] wrong, indeed criminal." (Id. at 23:20-21.)

43. Cohmad was formed in February 1985 by Madoff and his friend and former neighbor Sonny Cohn.

44. For over two decades, Cohmad and the Cohmad Representatives actively funneled investors' money to BLMIS and received substantial benefits for their participation in Madoff's fraudulent scheme.

45. In addition to fostering the BLMIS Ponzi scheme, Cohmad and the Cohmad Representatives, as well as their families, were among the primary beneficiaries of this scheme, reaping hundreds of millions of dollars of other BLMIS investors' money through the IA Accounts held in their own name at BLMIS ("BLMIS Cohmad Family IA Accounts").

Defendants knew or should have known that the trading activity purportedly conducted in their BLMIS IA accounts was patently false on its face, and that their purported returns and profits were fictitious.

46.    In an effort to hinder, delay and defraud authorities from detecting the fraud, BLMIS did not register as an Investment Advisor until September 2006.

47.    At all times relevant hereto, the liabilities of BLMIS were significantly greater than the assets of BLMIS, and for at least the last several years, the liabilities of BLMIS were billions of dollars greater than the assets of BLMIS.  At all relevant times hereto, BLMIS was insolvent in that (i) its assets were worth less than the value of its liabilities; (ii) it could not meet its obligations as they came due; and (iii) at the time of the transfers, BLMIS was left with insufficient capital.

48.    The connections between Cohmad and BLMIS were so pervasive that they acted in many respects as interconnected arms of the same enterprise.  As such, upon information and belief, at all relevant times hereto, Cohmad and the Cohmad Representatives were aware of the BLMIS Ponzi scheme.

**Personal Relationships Among the Madoffs and Cohmad Representatives**

49.    The personal ties among the Cohmad Representatives, Madoff and BLMIS reach back decades and involve many family and personal relationships.  In fact, the directors and officers of Cohmad include: Peter Madoff (Madoff's brother), Milton Cohn (Sonny's brother), and Marcia Cohn (Sonny's daughter), along with Sonny Cohn, Madoff, Jaffe and Buccellato. Shana Madoff, who is Madoff's niece and Peter Madoff's daughter, acted as compliance counsel to both BLMIS' and Cohmad.

50.     Upon information and belief, Sonny Cohn had worked with Delaire (and Delaire's father) since the 1960's at the broker-dealer firm of Cohn, Delaire & Kaufman (nee Cohn & Delaire).  Upon information and belief, Bucacellato worked at Cohn, Delaire & Kaufman.

51.     Upon information and belief, in June 1986, a company called Cohn, Delaire & Madoff Inc. ("CD&M") was formed in New York by Maurice Cohn, Delaire, and Madoff. CD&M, which was not a registered broker-dealer, is now inactive, and no information is publicly available about the business in which CD&M was engaged.

52.     Upon information and belief, Jaffe, who is listed as Cohmad's vice president, has another major tie to BLMIS: he is married to Ellen Shapiro Jaffe, the daughter of the 95-year-old apparel mogul Carl Shapiro, a friend of Madoff's for over 50 years who, aside from being one of BLMIS' earliest and largest investors, considered Madoff to be like a son to him.

53.     Upon information and belief, Jaffe, Marcia Cohn, and Greenberg worked together for another broker-dealer, Cowen & Company, and all moved to Cohmad during the period between 1986 and 1989.

54.     Madoff listed Jaffe and Sonny Cohn as personal references on his membership application to the Palm Beach Country Club – an organization that was key in Jaffe's job of recruiting high-net-worth investors for BLMIS.

55.     Peter Madoff listed Sonny Cohn as a personal reference on his membership application to the Trump International Golf Club ("Trump") in West Palm Beach, Florida. Further, on his Trump application, Peter Madoff listed the main telephone number for BLMIS as Sonny Cohn's telephone number.

**The Relationship Between BLMIS and Cohmad: Customer Referrals and Commissions**

56.     Upon information and belief, while allegedly managing billions of dollars for individuals and foundations at BLMIS, Madoff shunned one-on-one meetings with most of these investors, wrapping himself in a Wizard of Oz-like aura, making Madoff and BLMIS ever more desirable to those seeking access.  Madoff used the secrecy surrounding BLMIS to build up an appearance of prestige and exclusivity, such that many of BLMIS' victims felt privileged to be allowed to invest with Madoff and BLMIS, and thus refrained from asking too many questions.  Upon information and belief, Cohmad existed in part to facilitate Madoff's and BLMIS' IA business and assist in the maintenance and growth of the BLMIS Ponzi scheme.

57.     Cohmad and the Cohmad Representatives sought out potential victims, whom they introduced to BLMIS.  Likewise, Cohmad and the Cohmad Representatives assisted and arranged the opening of customer accounts with BLMIS.

58.     The Cohmad Representatives were compensated for placing investors' money in the BLMIS Ponzi scheme.  For the Cohmad Representatives other than Sonny Cohn and Jaffe, BLMIS would transmit money directly to Cohmad, which would then compensate the Cohmad Representatives.  For at least the last six years, BLMIS directly paid Sonny Cohn, ostensibly the CEO of a separate firm.

59. For the time period for which BLMIS records are currently available, which at the time of filing extends back to January 1996, BLMIS made payments to Cohmad on at least a monthly basis. For the period from 1996 – 2008, the known payments to Cohmad total **$98,448,678.84**. A list of known payments from BLMIS to Cohmad, from 1996-2008, is attached as Exhibit 1 hereto. The yearly breakdown of known payments to Cohmad is as follows:

| Year | Amount |
|------|--------|
| 1996 | $4,789,019.62 |
| 1997 | $7,378,789.26 |
| 1998 | $8,098,228.23 |
| 1999 | $9,874,438.90 |
| 2000 | $10,415,793.21 |
| 2001 | $9,892,273.82 |
| 2002 | $10,905,265.27 |
| 2003 | $9,462,247.47 |
| 2004 | $6,745,439.44 |
| 2005 | $7,239,978.09 |
| 2006 | $6,449,342.84 |
| 2007 | $4,583,267.63 |
| 2008 | $2,614,595.06 |
| **TOTAL:** | **$98,448,678.84** |

60. For the time period from 2002 to the present, BLMIS made direct payments to Sonny Cohn personally on at least a monthly basis. For this period, the known payments from BLMIS to Sonny Cohn are **$14,601,213.15**. Since at least November 2001, BLMIS paid Sonny Cohn $8,000.00 every month, and paid additional sums each quarter. A list of known payments from BLMIS to Sonny Cohn, from 2001-2008, is attached as Exhibit 2 hereto. The yearly breakdown of known payments to Sonny Cohn since 2002 are:

| Year | Amount |
|------|--------|
| 2002 | $2,437,165.00 |
| 2003 | $2,350,600.00 |
| 2004 | $1,882,831.05 |
| 2005 | $1,930,617.10 |
| 2006 | $2,000,000.00 |
| 2007 | $2,000,000.00 |
| 2008 | $2,000,000.00 |
| **Total** | **$14,601,213.15** |

61. Cohmad hand delivered to BLMIS, on almost a monthly basis, requests for payment – often stating that the requests were for "professional services" and other times not even referencing a particular reason for payment. Those requests correlate almost precisely with the fees recognized as income on Cohmad's income statements and the actual payments made by BLMIS.

62. Upon information and belief, Cohmad provided to the SEC unaudited income statements. These statements included as income fees for "account supervision," which appear to include fees paid to Cohmad by BLMIS for accounts referred by Cohmad's Representatives.

63.    For each year from 2000 to 2008, the fees paid by BLMIS to Cohmad for "account supervision" (i.e., accounts referred to BLMIS by Cohmad Representatives) represented the vast majority of Cohmad's income, as set forth on the following chart.

| YEAR | Fees for Account Supervision Listed on Income Statements | Total Income to Cohmad | Percentage of Cohmad's Total Income |
|---|---|---|---|
| 2000 | $10,415,284.35 | $13,801,556.83 | 75.46% |
| 2001 | $9,892,314.11 | $12,370,678.82 | 79.97% |
| 2002 | $10,305,265.07 | $12,505,818.33 | 82.40% |
| 2003 | $9,462,247.47 | $10,376,164.70 | 91.19% |
| 2004 | $6,745,438.44 | $7,760,711.65 | 86.92% |
| 2005 | $7,239,978.07 | $8,070,855.01 | 89.71% |
| 2006 | $6,449,343.24 | $7,177,126.17 | 89.86% |
| 2007 | $4,255,062.89 | $4,934,157.49 | 86.24% |
| 2008 | $2,665,092.01 | $3,118,294.42 | 85.47% |
| **TOTAL** | **$67,430,025.45** | **$80,115,363.42** | **84.17%** |

64.

65.     The foregoing chart does not include the fees paid to Jaffe or Sonny Cohn. When considering the amounts paid directly from BLMIS to Sonny Cohn, the percentage of Cohmad's income paid by BLMIS is considerably higher, as detailed in the following table, which extends back to 2002, when payments to Cohn were made separately.

| YEAR | Fees from BLMIS to Cohn and Cohmad | Total Income to Cohmad Including Payments to Cohn | Percentage of Total Income to Cohn and Cohmad |
|------|-----------------------------------|--------------------------------------------------|----------------------------------------------|
| 2002 | $12,742,430.07 | $14,942,983.33 | 85.27% |
| 2003 | $11,812,847.47 | $12,726,764.70 | 92.82% |
| 2004 | $8,628,269.49 | $9,643,542.70 | 89.47% |
| 2005 | $9,170,595.17 | $10,001,472.11 | 91.69% |
| 2006 | $8,449,343.24 | $9,177,126.17 | 92.07% |
| 2007 | $6,255,062.89 | $6,934,157.49 | 90.21% |
| 2008 | $4,665,092.01 | $5,118,294.42 | 91.15% |
| **TOTAL** | **$61,723,640.34** | **$68,544,340.92** | **90.05%** |

66.     Upon information and belief, out of the money it received from BLMIS, Cohmad would keep a portion for itself and then distribute the majority of the money to the Cohmad Representatives, based on the cash value of the BLMIS customer accounts that the Cohmad Representatives referred to BLMIS.

**Cohmad's Commissions were Based on the Net Cash Value of Customer Accounts**

67.     BLMIS issued to its clients – including those referred by Cohmad and the Cohmad Representatives – monthly or quarterly statements purportedly showing the securities that were owned in, or had been traded through, the BLMIS' customers' accounts, and the growth of and profit in each of those accounts. The BLMIS statements were a complete fabrication. The securities purchases and sales depicted in the account statements never occurred

and the profits reported therein were entirely fictitious. At the Plea Hearing, Madoff admitted that he never in fact purchased any of the securities he claimed to have purchased for customer accounts. Indeed, based on the Trustee's investigation to date and with the exception of isolated individual trades for certain clients other than the Defendants, there is no record of BLMIS having cleared any purchase or sale of securities at the Depository Trust & Clearing Corporation, the clearing house for such transactions, or any other trading platform on which BLMIS could have reasonably traded securities.

68. During the entire Madoff Ponzi scheme, certain investors requested and received distributions of the "profits" listed for their accounts, although those "profits" were in fact fictitious. As such, in a variety of instances, a customer of BLMIS continued receiving statements showing that he or she or it had a significant amount of money under management, despite the fact that the customer had already withdrawn more money than the customer had ever deposited. Put another way, there were customers that withdrew more money than they had deposited, on the mistaken belief that they had a positive account balance because statements rendered by BLMIS continually included the accumulating fictitious profits.

69. Cohmad and the Cohmad Representatives were not deceived by the BLMIS customer statements or the fictitious profits. In fact, Cohmad and BLMIS set up a database whereby Cohmad monitored the actual cash value of a BLMIS customer's account without considering the fictitious profits. This database was developed by a BLMIS employee, and the technical support was provided by BLMIS.

70.     The clear arrangement among BLMIS, Cohmad, and the Cohmad Representatives was that compensation was based on the health and growth of the BLMIS Ponzi scheme, which was based upon the actual amount of cash in the BLMIS accounts of customers referred by the Cohmad Representatives. The money paid by BLMIS to Cohmad, which in turn Cohmad paid to the Cohmad Representatives, was based on the amount of money under management at BLMIS that the Cohmad Representatives steered to BLMIS, without regard to fictitious profits. Specifically, each registered representative's commission was based on the money under management for the specific IA accounts that he/she brought in, inclusive of cash additions and withdrawals within a period year. The fact that Cohmad and Cohmad Representatives were compensated based on actual money invested in the BLMIS accounts of customers referred by them rather than by the total of the amount invested and fictitious profits shown on the BLMIS statements, indicates that Cohmad and the Cohmad Representatives had actual knowledge of the Ponzi scheme.

71.     Cohmad maintained a separate database on BLMIS' network (the "Cohmad Cash Database") which consisted solely of the BLMIS customer accounts that had been referred by the Cohmad Representatives other than Sonny Cohn and Jaffe. Upon information and belief, the Cohmad Cash Database was used to monitor BLMIS customer accounts for those customers referred by Cohmad Representatives to BLMIS other than Sonny Cohn and Jaffe and to calculate the commissions to be paid by BLMIS to Cohmad for the benefit of the Cohmad Representatives other than Sonny Cohn and Jaffe.

72.     For each victim referred to BLMIS by a Cohmad Representative other than Jaffe and Sonny Cohn, the Cohmad Cash Database calculates and reports the following:

     a.     the name of the owner of the BLMIS customer account,

     b.     the tax identification information of the BLMIS customer,

     c.     the Cohmad Representative associated with the referral for that BLMIS customer account,

     d.     the date and amount of each deposit into and each withdrawal from the BLMIS customer account,

     e.     the total amount of cash under management at BLMIS in the account,

     f.     the amount of commissions due to the particular Cohmad Representative, and

     g.     the BLMIS account number assigned to the BLMIS customer account.

73.     The Cohmad Cash Database was originally maintained by Belle Jones, an employee of BLMIS.  In recent years, the Cohmad Cash Database was maintained by Buccellato, and Buccellato entered the data contained therein.

74.     The Cohmad Cash Database provided, on an account by account basis, the true value (i.e. the account balance without reference to the fictitious profits) of each BLMIS account referred by a Cohmad Representative other than Sonny Cohn and Jaffe.  Importantly, in situations where BLMIS customer statements showed a positive balance due to fictitious profits, but the account was actually in a negative position because the customer had withdrawn from the account more money than the customer had deposited, the Cohmad Cash Database showed the negative account balance of the BLMIS customer account.

75.    In general, customer accounts at a legitimate brokerage would not maintain active accounts with negative net equity, net equity being the amount of deposits minus the amount of withdrawals in the brokerage account.  Upon information and belief, because the Cohmad Representatives were privy to the Cohmad Cash Database showing negative account balances, the Cohmad Representatives knew or should have known that BLMIS IA business was a fraud.

76.    In calculating the amount of commissions due to Cohmad Representatives, the Cohmad Cash Database was used to determine, for each IA account Cohmad referred to BLMIS, the money under management, based on the net cash activity and certain related subjective adjustment.  A subjective percentage, generally ranging from 0.1% 0.9%, would then be applied to the money under management and weighted adjustments would be made to consider intra-year cash activity.  Remarkably, the Cohmad Cash Database would reduce the commissions due a representative based in the event of negative net cash activity in BLMIS IA accounts.  This means that despite the fact that certain BLMIS customer accounts appeared to have significant positive balances, due to fictitious profits, Cohmad and the Cohmad Representatives knew otherwise and would no longer be paid once a customer withdrew all of the cash that they deposited.

77.   The Cohmad Cash Database generated reports detailing the amount of money each Cohmad Representative, other than Sonny Cohn and Jaffe, had under management, the amount of the adjustment based on intra year net cash activity, and the annual commissions to be paid to each Cohmad Representative other than Sonny Cohn and Jaffe.   These statements (hereinafter "Payment Schedules") are included as Exhibit 3; Figure 1 below shows the Payments Schedules for 2008.

**Figure 1 - Payment Schedule from BLMIS to Cohmad for 2008**

78. As can be seen, once the Payment Schedules were created, they were distributed to at least Madoff, Sonny Cohn and Marcia Cohn. As the Payment Schedule above in Figure 1 details, the Cohmad Registered Representatives received approximately 25 basis points, on an annualized basis, for monies that their clients invested with BLMIS, with adjustments made based on net cash activity, that occurred throughout the year. BLMIS then paid one twelfth of the total commission on a monthly basis. The basis points appear to have changed over time, and could be as high as 47.5 basis points and as low as 23.75 basis points.

79. These net activity calculations appear to have also involved the use of so-called "Capital Movement" reports generated on behalf of BLMIS by BLMIS employee Frank DiPascali. Upon information and belief, Dipascali had a standing report programmed that would pull all of the Cohmad related IA accounts and their underlying cash deposits and cash withdrawals.

80. The amounts of commissions generated on the Payment Schedules corresponded to the amount of money paid by BLMIS to Cohmad and the Cohmad Representatives.

81. Upon information and belief, at no time did Cohmad or the Cohmad Representatives object to the manner in which commissions were calculated or paid by BLMIS.

82. Upon information and belief, the Cohmad Cash Database, the Payment Schedules, and the commissions actually paid, demonstrate clearly that the Cohmad Representatives were aware of the fictitious profit status of the BLMIS customer accounts that they referred to BLMIS.

83. Upon information and belief, none of the documents showing payments from BLMIS to Cohmad, Cohmad Representatives, or Sonny Cohn include the fees Jaffe was paid.

When asked about those fees on February 4, 2009, Jaffe, in his on-the-record testimony with the Massachusetts Division of Securities, exercised his Fifth Amendment Rights and refused to answer the question.

## The Intertwined Public Relationship

84.     Upon information and belief, in many instances, the Cohmad Representatives would meet with potential victims and state that they were representatives of Madoff and/or BLMIS. Upon information and belief, during such meetings, the Cohmad Representatives would inform these potential victims that there still might need to be a meeting between them and Madoff or BLMIS. Upon information and belief, many of the victims introduced to the BLMIS Ponzi scheme never heard of Cohmad and had no knowledge that the Cohmad Representatives worked for anyone other than Madoff and/or BLMIS.

85.     BLMIS also held out Cohmad Representatives to its customers as registered representatives of BLMIS.   When a BLMIS account was opened, BLMIS issued a form containing pertinent information about the BLMIS customer (hereinafter "BLMIS Opening Forms") for signature by the customer.   An example of a BLMIS Opening Form is included as Figure 2 below.

**Figure 2 - BLMIS Opening Form**

86.     As can be seen in Figure 2, the Opening Form includes a field for "Reg. Rep" or the registered representative of the account, as well as the identity of the individual that referred or "introduced" the client to BLMIS.  In the example above, the client was introduced by Delaire and Delaire also was listed as the registered representative of the client.  On information and belief, Delaire was never employed by BLMIS, and with the exception of a two month period in 1992, never was a BLMIS registered representative and was not listed as such with NASD or FINRA.

87.     In a variety of situations, however, despite the fact that an individual BLMIS customer was referred by another BLMIS customer, a Cohmad Representative was still held out as being a registered representative of BLMIS for the referred customer account.  An example of one such instance can be seen in Figure 3, below.



Figure 3 - Opening Form for Non-Cohmad Referral

88.     In the case of BLMIS Account No. 1CM089, the "referral" listed was this customer's co-worker, who also was a BLMIS customer holding, Account No. 1CM241. Nonetheless, even though he did not refer this account to BLMIS, Sonny Cohn was listed as the registered representative for this account.

89.     Upon information and belief, on various BLMIS Opening Forms provided to potential and eventual customers, BLMIS listed one of the Cohmad Representatives as the applicable BLMIS registered representative for the account, thereby indicating to them that the Cohmad Representatives were representatives of BLMIS.

90.     On other occasions, Cohmad and the Cohmad Representatives acted more like subsidiaries and employees of BLMIS.  In luring investors, Sonny Cohn described the activities of BLMIS as if it were Cohmad's activities.  As can be seen in Figure 4, in a Nov. 21, 1991, letter to a prospective customer enclosing information and account opening statements to open an account at BLMIS, Cohmad's then-president Sonny Cohn wrote: "Our primary business is not managing client accounts.  We do manage accounts for family and friends using a simplistic, and most important, a very conservative strategy in a disciplined manner, always 'insuring' the accounts against major loss by using put options."  A copy of this letter also is included as Exhibit 4.

**Figure 4 - November 21, 1991 Letter from Sonny Cohn**

91.     The information that Sonny Cohn and other Cohmad Representatives provided to potential investors indicated that Cohmad worked with BLMIS, and, as shown in Figure 5, below explicitly stated that "As a result of [Cohmad]'s association with [BLMIS] and the expertise of Cohmad's professional staff, we are able to offer our clients … the type of service they deserve." A copy of this material is included as Exhibit 5 hereto.

**Figure 5 - Cohmad Information**



92.     Even when they did not hold themselves out as working directly for Madoff or BLMIS, the Cohmad Representatives informed their victims that they were personally familiar with the Madoff system, that they knew how it worked, and that they personally tracked it and

followed it for many years.  If those representations by the Cohmad Representatives were true, then they clearly knew about the BLMIS Ponzi scheme and engaged in the fraud itself.  If those statements made in the course of procuring investors were false, then the Cohmad Representatives were and had engaged in a fraud.

93.    Additionally, for at least a period of time, certain Cohmad Representatives provided customers with information about the fictitious profits.  For instance, using Cohmad letterhead, Sonny Cohn provided account statements to certain customers, showing their account balance with BLMIS, including fictitious profits in those accounts, as shown in Figure 6, below, a copy of which is also included as Exhibit 6 hereto.

**Figure 6 - July 15, 1992 Statement Issued by Cohmad**



COHMAD SECURITIES CORPORATION

## COHMAD SECURITIES CORPORATION

July 15, 1992

C & M Trading Account

(At Bernard L. Madoff Investment Securities)

Portfolio Management Report as of June 30, 1992

## C & M Trading Account

## (At Bernard L. Madoff Investment Securities)

| | |
|---|---|
| Participant: | |
| Initial Investment: | $100,170.55 |
| Capital Additions: | $0.00 |
| Capital Withdrawals: | $0.00 |
| Total Investment: | $100,170.55 |
| Equity as of 12/31/91: | $0.00 |
| Total Equity as of 6/30/92: | $104,060.98 |

94. Similarly, Sonny Cohn would refer to BLMIS' activity and purposes as though it were his own. As can be seen in Figure 7, in July 17, 1992 letter to a customer, which accompanied the statement in Figure 6, above, Sonny Cohn, writing on behalf of Cohmad, yet referring to an account with BLMIS, indicated that he was involved in the management of the account at BLMIS, stating "[O]ur 'mission' is to protect your investment (and mine!). To accomplish this, we maintain our discipline and stick with the same strategy, by buying a portfolio of 'blue chip' equities, selling call (index) options on your portfolio, and buying put (index) options to protect your portfolio against violent bear markets. Once again, we are not economists or security analysts. We are risk managers and our associates are very good at what they know best—namely, trading." A copy of this letter is also included as Exhibit 7 hereto.

**Figure 7 - July 17, 1992 Letter from Sonny Cohn**

95.     The July 17, 1992 letter above further demonstrates the intertwined relationship between Cohmad and BLMIS.  Sonny Cohn is "introducing" BLMIS employees as Cohmad employees.  At the end of the letter, Sonny Cohn "introduces" Belle Jones as the "brains" behind the operation and the contact person for the account in question.  From at least 1992 through 2006, Belle Jones was an employee of BLMIS, not Cohmad, and was on BLMIS' payroll.

96.     Upon information and belief, BLMIS employees often performed work for Cohmad and the Cohmad Representatives.

97.     Upon information and belief, Shana Madoff, who operated as compliance counsel for BLMIS, also acted as compliance counsel for Cohmad.

98.     Internal documents, such as those in Figures 8 and 9 below (also included as Exhibit 8), show that BLMIS acted as a an administrator in connection with Cohmad's operations, including administering employee benefits for Cohmad and its employees, such as the dental plan, life insurance and even paying FICA payroll taxes.   Indeed, BLMIS was self insured, and provided coverage to Cohmad employees in that plan.

**Figure 8 - BLMIS Detail of Benefits Paid for Cohmad Employees**

**Chart I-A : Employee Benefits per Employee per Month**

| COHMAD | DEP | 1 UNUM NY DIS | 2a *LTD EMPLYR (40%) | 2b *LTD EMPLEE (60%) | 3 UNUM LIFE | 4 SUPP LIFE | 6 CHUBB POS | 6a EMP PMT | 7 CHUBB LIFE | 8 EMPLEE DENTAL | 10 TOTAL COMA: | ADP |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Berman, Stanley | 0 | | | | | | | | | | $0.00 | Yes |
| Buccellato, Rosalie | 0 | $5.65 | | | | | | | | | $5.65 | Yes |
| Cohn, Marcia | 1 | $5.65 | $14.73 | $22.14 | $35.78 | | $170.57 | $47.30 | $8.00 | $33.31 | $234.73 | Yes |
| Cohn, Maurice | 2 | $5.65 | $36.00 | $54.00 | $39.75 | | $332.37 | $90.30 | $8.00 | $65.80 | $421.77 | Yes |
| Greenburg, Jonathan | 1 | $5.65 | $36.00 | $54.00 | $39.75 | | $170.57 | $47.30 | $8.00 | | $259.97 | Yes |
| Moody, Elizabeth | 1 | $5.65 | $7.02 | $10.53 | $18.02 | $7.43 | $170.57 | $47.30 | $8.00 | $33.31 | $209.26 | Yes |
| Raghunauth, Martha | 0 | $5.65 | | | | | | | | | $5.65 | Yes |
| Tietze, Ursula | 0 | $5.65 | | | | | | | | | $5.65 | Yes |
| Yenesa, Africa | 1 | $5.65 | $5.58 | $8.37 | $14.31 | | $170.57 | $47.30 | $8.00 | $33.31 | $204.11 | Yes |
| | | | | | | | | | | | | |
| Chaplin, Stephen | 4 | $5.65 | $45.00 | $0.00 | $39.75 | | $675.39 | | $8.00 | | $773.79 | Yes |
| Delaire, Al Jr. | 2 | $5.65 | | | | | $422.67 | | $8.00 | | $436.32 | No |
| Jaffe, Robert | 4 | | | $0.00 | | | $675.39 | | $8.00 | | $683.39 | No |
| Jalon, Cyril | 2 | $5.65 | | | | | $422.67 | | $4.00 | | $432.32 | Yes |
| Delaire, Alvin III | 0 | | | | | | | | | | $0.00 | yes |
| Spring, Richard | 2 | $5.65 | | $0.00 | $39.75 | | $422.67 | | $8.00 | $65.80 | $541.87 | Yes |
| TOTAL COMA: | | $67.80 | $144.33 | $0.00 | $227.11 | $0.00 | $3,633.44 | $0.00 | $76.00 | $62.66 | $4,211.34 | |

Grey area is NOT paid by COMA. Fees are deducted from the employee's paycheck.

Mike pays directly to Madoff

---

**Figure 9 - BLMIS FICA Payments for 1997**

Page: 1  |  Fica Salary Breakdown 1997  |  3/26/2009  |  Cohmad 04

| Month | Admin 00 Salary | Admin 00 Fica | Trading Asst & Research 01 Salary | Trading Asst & Research 01 Fica | Systems 02 Salary | Systems 02 Fica | Back Office 03 Salary | Back Office 03 Fica | Cohmad 04 Salary | Cohmad 04 Fica | Month Total |
|---|---|---|---|---|---|---|---|---|---|---|---|
| January | $886,055.35 | $37,878.64 | $140,527.80 | $30,924.43 | $157,326.61 | $11,876.08 | $173,254.50 | $13,049.40 | $471,926.36 | $18,242.56 | $1,940,861.74 |
| February | $314,363.59 | $11,268.95 | $114,913.00 | $25,719.22 | $130,151.09 | $9,628.90 | $88,703.00 | $5,961.16 | $26,302.66 | $1,628.96 | $726,770.53 |
| March | $379,322.10 | $12,269.64 | $55,484.00 | $19,559.61 | $121,568.20 | $9,172.53 | $98,116.88 | $4,690.43 | $28,130.78 | $1,855.60 | $730,178.77 |
| April | $905,021.27 | $28,646.81 | $296,515.20 | $115,826.55 | $532,976.00 | $34,526.64 | $191,152.76 | $12,107.93 | $978,054.54 | $20,142.94 | $2,875,970.64 |
| May | $328,704.99 | $11,123.28 | $81,442.00 | $14,761.38 | $127,048.00 | $7,125.27 | $99,725.25 | $5,418.42 | $28,604.01 | $1,512.37 | $702,664.97 |
| June | $452,524.24 | $13,610.99 | $86,057.40 | $15,459.59 | $129,578.00 | $7,314.89 | $88,798.25 | $3,781.05 | $27,713.47 | $1,778.94 | $826,016.82 |
| July | $419,304.98 | $14,541.30 | $119,546.20 | $18,403.99 | $159,810.00 | $8,973.20 | $120,328.40 | $4,886.29 | $642,620.05 | $13,495.68 | $1,521,712.32 |
| August | $364,238.06 | $11,284.54 | $97,674.40 | $12,268.32 | $135,710.00 | $7,282.59 | $78,577.00 | $3,459.89 | $528,671.76 | $1,318.16 | $761,482.72 |
| September | $343,834.94 | $10,401.38 | $96,937.00 | $13,655.74 | $129,973.00 | $6,799.87 | $85,339.00 | $3,386.75 | $525,215.21 | $1,120.54 | $716,663.43 |
| October | $445,377.08 | $12,849.16 | $121,340.00 | $17,614.38 | $164,609.00 | $7,544.15 | $156,777.50 | $4,636.96 | $542,334.93 | $10,257.53 | $1,560,342.69 |
| November | $364,553.26 | $10,032.35 | $103,257.00 | $11,107.38 | $158,961.00 | $6,361.17 | $86,355.50 | $2,727.73 | $105,852.60 | $2,289.79 | $851,537.80 |
| December | $478,321.43 | $14,592.45 | $166,645.44 | $14,904.84 | $220,042.00 | $8,134.88 | $130,361.00 | $3,546.34 | $541,014.80 | $1,924.54 | $1,079,687.78 |
| Totals: | $5,461,651.31 | $188,299.49 | $1,480,339.44 | $310,203.43 | $2,167,772.90 | $124,960.16 | $1,397,489.07 | $67,565.35 | $3,045,641.23 | $75,567.81 | $14,319,490.21 |

Commission Expense 627-01

| January $1,213,097.34 | April $1,009,299.04 | July $1,489,412.62 | October $1,517,000.40 |
|---|---|---|---|
| February $1,024,113.42 | May $1,039,477.77 | August $1,455,504.77 | November $928,565.88 |
| March $1,041,061.46 | June $1,219,932.28 | September $1,286,222.14 | December $738,411.40 |

| Quarter #1 Total $3,278,262.12 | Quarter #2 Total $3,268,709.09 | Quarter #3 Total $4,231,139.53 | Quarter #4 Total $3,183,977.68 |
|---|---|---|---|

YTD Total $13,962,088.42

* FICA figures of the the traders and the assitants wore added together to form the combined figure under 01

99. Similarly, as shown in Figure 10, below, the 2007-2008 transfers from BLMIS to Cohmad also included a $400,000.00 retirement bonus for Berman, despite the fact that he was purportedly an employee of Cohmad and one of the Cohmad Representatives, not and employee of BLMIS.

**Figure 10 - Memo Detailing Payments from BLMIS to Cohmad**



100.     At all relevant times, Cohmad has been a tenant of BLMIS, sharing its office space with BLMIS on the 18th Floor at 885 Third Avenue.  As part of its sublease, Cohmad procures its electricity, market data and exchange fees, a telephone lease, and long-distance telephone service through BLMIS.  BLMIS provided Cohmad with a computer network.  BLMIS issued regular invoices to Cohmad for these expenses, as well as for rent, although Cohmad had no written lease agreement with BLMIS.

101.     There is no signage now, and upon information and belief, there has never been any signage that indicates that Cohmad is a tenant totally within the confines of BLMIS' space. Cohmad did not employ a receptionist, but did on occasion, utilize the services of the BLMIS receptionist.  More important, BLMIS never indicated to its landlord at 885 Third Avenue that it was leasing space to Cohmad, despite the fact that BLMIS' lease required it to identify such sub-tenants.

102.    Cohmad's offices at 885 Third Avenue were interspersed among BLMIS' offices on the 18th floor, with nothing to indicate that the Cohmad Representatives worked for a company other than BLMIS.  Further, as can be seen in Figure 11 below, Sonny Cohn's office (shaded in blue) was adjacent to members of Madoff's family (all shaded in orange), namely: Charles Weiner (Madoff's nephew and BLMIS Director of Administration), Ruth Madoff (Madoff's wife), and Shana Madoff (Madoff's niece and BLMIS compliance counsel).  The second Cohmad office (shaded in green) was on the opposite side of the building, and is where Marcia Cohn, Delaire, Jalon, Greenberg, Kurzrok and Buccellato all maintained desks.

**Figure 11 - Floor Plan of 18th Floor 885 Third Avenue**



103.    Upon information and belief, although BLMIS employees did not have access to Cohmad's offices, both Sonny Cohn and Marcia Cohn had access to BLMIS' offices.  Significantly, although Cohmad's offices were located on the 18th floor, at least Marcia Cohn had a master key which granted access to all of BLMIS' offices, including the 17th floor, where the fraudulent activity of the IA business occurred.  Indeed, the historical information related to Marcia Cohn's door access cards for the last year indicates that her card was used to gain access

to the 17th floor with regularity, even on December 11, 2008, the day on which Madoff was arrested. On various occasions and dates, Marcia Cohn used her card to gain access to the following three doors on the 17th floor: "885 17 CAGE", "885 17 ELEVATOR LOBBY", and "885 17 STAIR B". A document detailing that access is attached as Exhibit 9.

104. Marcia Cohn's access to the 17th Floor is particularly significant here, as even most of BLMIS' employees did not have access to the 17th Floor. BLMIS' market maker business and BLMIS' proprietary trading desk were located on the 18th and 19th floors, along with Cohmad. The following factors about the 17th floor are notable:

a. BLMIS' IA business (known as "House 17"), located one floor below Cohmad's office on the 18th floor, was the home of the operations of the infamous Ponzi scheme.

b. The reported day-to-day operations of the IA Business 17th Floor were antiquated. The IA business utilized IBM Application System 400 computers (the "AS 400 System") – that is computers that were introduced in 1988 for small businesses. The AS 400 System was used to report customer cash transactions, prepare customer statements and generate false trade confirmations. The customer cash transactions were maintained on handwritten logs before being manually entered into the system. In fact, the running balance of available cash was manually recorded on index cards and reported to Madoff on a regular basis.

c. Only 6 of the approximately 21 BLMIS employees in the IA Business had BLMIS e-mail accounts.

d.  Upon information and belief, three individuals worked in the back area, known as the "cage." A "cage" is a term known in the securities industry as the area where currency, checks and physical securities are stored, and this term was widely used during the time when securities were typically stored in-house. In BLMIS' "cage," however, individuals kept track of the actual inflow and outflow of money, that is, the checks and wires coming into and out of the House 17 bank accounts.

e.  Upon information and belief, in the open area of the 17th floor, other individuals researched historical equity prices from various sources including Bloomberg, Thompson Financial Services, and issues of the Wall Street Journal. These equity prices were then utilized to create fictitious trades for past trading periods. In the center of the floor, in an area surrounded by glass walls and referred to as the "fish bowl," two individuals worked inputting the trades into House 17's AS 400 System, which was not connected to any external system that executed trades and was therefore unable to have facilitated any actual securities trades.

f.  The AS 400 System would then generate false trade confirmations for the fictitious trades. The value of securities based on these trades was then automatically calculated by the system for the creation of the IA customer statements. Most of the IA customer files and copies of monthly statements were stored on the 17th Floor.

g.  Entry to the IA Business on the 17th Floor required a key-card or a key.

h. The majority of BLMIS employees did not have authority to enter the 17th Floor and could not do so with their BLMIS-issued key card. They knew little about the 17th Floor, and/or had never been on the 17th Floor.

105. In short, the 17th Floor was cloaked in mystery, and, upon information and belief, Madoff kept the 17th Floor off-limits to all but a select few employees and family members – a select group that included Marcia Cohn. Upon information and belief, Kurzrok and Buccellato also accessed the 17th Floor, as did Cohmad employee John Joseph Kelly, an unnamed non-defendant.

106. Cohmad has indicated that at times BLMIS' trading desk executed trades of securities through Cohmad. The Cohmad Representatives should have known that the only reason for BLMIS to request these trades was that BLMIS was not actively trading in the IA Accounts, and that House 17 did not have the capability of executing trades.

**The Curious Case Of Sonja Kohn**

107. Upon information and belief, Sonja Kohn ("Kohn"), also known as Sonya Kohn, is a one time resident of Vienna, Austria, whose current location is unknown.

108. Upon information and belief, Kohn founded the Bank Medici in Vienna, Austria.

109. Upon information and belief, Kohn moved to Monsey, New York in or about 1985, and became friends with Madoff at that time.

110. Upon information and belief, in the mid-1990's, Kohn moved to Europe and began recruiting victims into the BLMIS Ponzi scheme.

111.    Kohn is not listed in the CRD as an employee of Cohmad and was not registered in any capacity with Cohmad, and did no work for it.  Nonetheless, BLMIS transferred money to Kohn through Cohmad.  The Payment Schedules have the hand written initials "SK," which upon information and belief, stands for Kohn.

112.    As can be seen in Figure 12 below in 2004, an internal document notes that "Payments from [BLMIS] includes payments for [Kohn] in the amount of $87,792."  A copy of this document is also included as Exhibit 10.

**Figure 12 - 2004 Calendar of Payments**



NOTE: Payments from Madoff includes payment for SK in amt. of $87,792.

113.    As can be seen below in Figure 12, the amount of $87,792 is included as an annual payment for "SK" in the above Payment Schedules.  Upon information and belief, "SK" stands for Kohn.  Likewise, on a draft Payment Schedule from 2006, included below as Figure 13, the name "Sonya Cohen" is included on the line item for the amount of $87,792.

**Figure 13 - 2006 Draft Payment Schedule**



114.    The payments from BLMIS to Cohmad included approximately $526,000 in payments for Sonya Kohn.

**The Massachusetts Action Against Cohmad**

115.    Cohmad also maintained an office in Boston, Massachusetts.  Accordingly, the Massachusetts Securities Division was authorized to regulate Cohmad.  On February 11, 2009,

the Massachusetts Securities Division suspended Cohmad's state broker-dealer license. According to the complaint, in that action, Docket No. 2009-0015,

a. Cohmad and BLMIS exhibited a "deeply intertwined relationship."

b. Subpoenas requiring the testimony of Jaffe were subject to "delay tactics." According to the Massachusetts Securities Division complaint, "Jaffe's multitudinous and often conflicting excuses [for not providing testimony in response to subpoenas] delved deeply into the realm of the absurd."

c. On February 4, 2009, Jaffe finally invoked his Fifth Amendment right to refuse to testify.

d. In response to subpoenas, Marcia Cohn, Sonny Cohn, and Delaire all refused to appear to testify.

e. Delaire failed to attend a deposition, scheduled for February 10, 2009.

**The Defendants Knew or Should Have Known About The Ponzi Scheme**

116. All defendants maintained customer accounts with BLMIS. Additionally, defendants named above, which consist of the families and extended families of the Cohmad Representatives, also had IA accounts with BLMIS, the BLMIS Cohmad Family IA Accounts.

117. At all times relevant hereto, one or more of the Defendants was a client of the IA Business. According to BLMIS' records, Defendants maintained at least the BLMIS Cohmad Family IA Accounts with BLMIS set forth on Exhibit 11. Upon information and belief, for each Account, one or more of the Defendants executed a BLMIS Customer Agreement, a BLMIS

Option Agreement, and/or a BLMIS Trading Authorization Limited to Purchases and Sales of Securities and Options, (the "Account Agreements") and delivered such papers to BLMIS at BLMIS' headquarters at 885 Third Avenue, New York, New York.

118. The Account Agreements were to be executed in New York, New York through securities trading activities that would take place in New York, New York. The BLMIS Cohmad Family IA Accounts were held in New York, New York, and one or more of the Defendants sent funds to BLMIS' account at JPMorgan Chase & Co., Account #000000140081703 (the "BLMIS Bank Account") in New York, New York for application to the BLMIS Cohmad Family IA Accounts and the presumed conducting of trading activities.

119. Between January 1996 and the Filing Date, one or more Defendants invested with BLMIS through multiple deposits to the BLMIS Bank Account. The BLMIS Bank Account was maintained at a JPMorgan Chase & Co. branch in New York, New York. Defendants have intentionally taken advantage of the benefits of conducting transactions in the State of New York and have submitted themselves to the jurisdiction of this Court for purposes of this proceeding.

120. The Defendants knew or should have known that BLMIS' IA Business was predicated on fraud, that they were benefitting from fraudulent transactions, and that the purported account activity of IA customers was inconsistent with legitimate trading activity and credible returns.

121. The Cohmad Representatives and their families are sophisticated investors. The Cohmad Representatives held themselves out as professional investment advisers. Upon information and belief, customers of the Cohmad Representatives relied on the Cohmad Representatives to exercise their skill and judgment in managing transactions. Given that at least

84% of the revenue of Cohmad's business was derived from its relationship with BLMIS, and the fact that they received commissions based on a net cash rather than some other metric, the Cohmad Representatives should have known that the business conducted by BLMIS was a Ponzi scheme.

122. The core of Cohmad's business was referring accounts to BLMIS and it was paid by BLMIS based upon such referrals. As such, the Cohmad Representatives if they were unaware of the Ponzi scheme, should have conducted due diligence with regard to BLMIS' IA business, especially since Cohmad and Cohmad Representatives represented that they were in fact familiar with BLMIS' investment strategies.

123. The Defendants knew or should have known that they were benefitting from fraudulent activity or, at a minimum, failed to exercise reasonable due diligence of BLMIS and its auditors in connection with the Ponzi scheme. Specifically, Defendants were on notice of the following indicia of irregularity and fraud due to the operation and/or relationship with Cohmad and/or by the activity in their BLMIS Cohmad Family IA Accounts but failed to make sufficient inquiry:

   a.   The BLMIS accounts reported an implausibly consistent—and consistently high—rate of return.

   b.   These implausibly high purported returns have enabled the Cohmad Representatives, other than Jaffe, and their family members to collectively withdraw at least at least $105,235,523 over and above any funds invested, from BLMIS between January 1996 and December 2008.

c.      The Defendants, including the Cohmad Representatives, knew or should have known that fictitious and backdated trading activity was being reported in the BLMIS Cohmad Family IA Accounts, and that the BLMIS Cohmad Family IA Accounts reflected fictitious holdings.

d.      BLMIS' statements to the Cohmad Representatives, their family members, and BLMIS customers referred by Cohmad reflected a consistent ability to buy stocks near their daily lows, and to sell stocks near their monthly highs, a timing of the market that is virtually impossible to achieve in the absence of deceit and manipulation. No experienced investment professional could have reasonably believed that this could have been accomplished legitimately. Indeed, upon information and belief, the Cohmad Representatives had their own trading accounts with Cohmad, and the Cohmad Representatives were making trades in such accounts over the same time period. As such, and based on their industry expertise, the Cohmad Representatives were aware of the performance in the market in general, and should have known that the IA Accounts were providing a rate of return that was inexplicable.

124.    Beyond these indicia of fraud, the Defendants ignored numerous other indicia of irregularity and fraud.   Among other things, the Defendants were on notice of the following indicia of irregularity and fraud but failed to make sufficient inquiry:

a.    The purported consistency of the IA Business returns was questioned in a May 2001 article entitled "Madoff Tops Charts; Skeptics Ask How" published in MAR/Hedge, a semi-monthly newsletter that is widely read by hedge fund industry players.   The article noted that many current and former traders, other money managers, consultants, quantitative analysts and fund of fund executives who are familiar with the split-strike conversion strategy purportedly used by Madoff to manage the assets questioned the consistency of the reported returns and observed that "others who use or used the strategy are known to have had nowhere near the same degree of success."

b.    A May 27, 2001 Barron's article entitled "Don't Ask, Don't Tell: Bernie Madoff is so secretive, he even asks investors to keep mum" following the industry newsletter raised similar concerns about the credibility of BLMIS' reported compound average returns of 15% for over a decade. The article noted the skepticism on Wall Street and lack of transparency around Madoff's IA Business based on Madoff's unwillingness to answer questions about his investment strategy.

c. The IA Business did not use either itself or outside brokers when buying or selling the securities it purported to manage and trade on a monthly basis on behalf of its investors.

d. BLMIS chose not to obtain funding from commercial lenders at lower interest rates than it paid out. As the Cohmad Representatives were aware, the BLMIS customer accounts that they referred, as well as their own BLMIS Cohmad Family Accounts, received far higher purported annual rates of return on their investments with BLMIS, as compared to the interest rates BLMIS would have had to pay commercial lenders during the relevant time period. As such, BLMIS accepted the investment capital referred by the Cohmad Representatives in lieu of other available alternatives that would have been more lucrative for BLMIS.

e. BLMIS, which reputedly ran the world's largest hedge fund, was purportedly audited by Friehling & Horowitz, an accounting firm that had three employees, one of whom was semi-retired, with offices located in a strip mall. No experienced investment professional could have genuinely believed it possible for any such firm to have competently audited an entity the size of BLMIS.

f. BLMIS' statements to investors reflected a consistent ability to trade stocks near their monthly highs and lows to generate consistent and unusual profits. No experienced investment professional, such as the

Cohmad Representatives, could have reasonably believed that this could have been accomplished legitimately.

g.  BLMIS functioned as both investment manager and custodian of securities. This arrangement eliminated another frequently utilized check and balance in investment management by excluding an independent custodian of securities from the process, and thereby furthering the lack of transparency of BLMIS.

h.  The compensation system utilized by BLMIS was atypical, in that BLMIS, the entity purportedly employing the hugely-successful and secret proprietary trading system, was compensated only for the trades that it executed, while the Cohmad Representatives, whose main role was to funnel money to BLMIS, received administrative fees and a share of the profits that would normally go to the entity in the position of BLMIS. This compensation arrangement, together with the lack of transparency and other factors listed herein, should have caused an experienced investment professional to question Madoff's operation.

i.  Based on some or all of the foregoing factors, many banks, industry advisers, and insiders who made an effort to conduct reasonable due diligence flatly refused to deal with BLMIS and Madoff because they had serious concerns that the IA Business operations were not legitimate. On information and belief, included among these were Societé Generale,

Goldman Sachs, CitiGroup, Morgan Stanley, Merrill Lynch, Bear Stearns, and Credit Suisse.

j.      BLMIS purported to convert all of its holdings to cash immediately before each quarterly report, a strategy that had no practical benefit but which had the effect of shielding BLMIS' purported trading activities from scrutiny.

k.      All of the Defendants were intimately involved with Madoff and had a close personal, if not familial, relationship with Madoff for decades.

125.    Prior to the Filing Date, BLMIS made payments or other transfers (collectively, the "Transfers") to one or more of the Defendants. The Transfers were made to or for the benefit of one of more of the Defendants.

126.    The Transfers were and continue to be customer property within the meaning of 15 U.S.C. § 78*lll*(4), and are subject to turnover pursuant to section 542 of the Bankruptcy Code.

127.    The Transfers were, in part, false and fraudulent payments of customer property for the referral of victims into the BLMIS Ponzi scheme by the Cohmad Representatives (the "Fraudulent Commissions"). Upon information and belief, Cohmad and the Cohmad Representatives, have received no less than $113,080,310.05 in Fraudulent Commissions.

128.    The Transfers were, in part, false and fraudulent payments of nonexistent profits supposedly earned in the BLMIS Cohmad Family Accounts ("Fictitious Profits"). Upon information and belief, Cohmad, the Cohmad Representatives and other Defendants have received in excess of $100,000,000.00 in Fictitious Profits.

129.     The Transfers are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and applicable provisions of N.Y. CPLR 203(g) (McKinney 2001) and N.Y. Debt. & Cred. §§ 273 – 276 (McKinney 2001).

130.     Of the Transfers, multiple transfers in the collective amount of at least approximately $94,051,546.36 (the "Six Year Transfers") were made during the six years prior to the Filing Date and are avoidable and recoverable under sections 544, 550(a)(1) and 551 of the Bankruptcy Code, applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3), and applicable provisions of N.Y. Debt. & Cred. §§ 273 - 276.

131.     Of the Six Year Transfers, multiple transfers in the collective amount of at least approximately $25,913,765.90 were made during the two years prior to the Filing Date (the "Two Year Transfers"), and are additionally recoverable under sections 548(a)(1), 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

132.     Of the Two Year Transfers, multiple transfers in the collective amount of at least approximately $2,047,402.09 were made during the 90 days prior to the Filing Date (the "90 Day Transfers"), and are additionally recoverable under sections 547, 550(a)(1) and 551 of the Bankruptcy Code and applicable provisions of SIPA, particularly 15 U.S.C. § 78fff-2(c)(3).

133.     To the extent that any of the recovery counts may be inconsistent with each other, they are to be treated as being pled in the alternative.

134.    The Trustee's investigation is on-going and the Trustee reserves the right to (i) supplement the information on the Transfers and any additional transfers, and (ii) seek recovery of such additional transfers.

**COUNT ONE**
**TURNOVER AND ACCOUNTING – 11 U.S.C. § 542**

135.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

136.    The Transfers constitute property of the estate to be recovered and administered by the Trustee pursuant to section 541 of the Bankruptcy Code and 15 U.S.C. § 78fff-2(c)(3).

137.    As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is entitled to the immediate payment and turnover from the Defendants of any and all Transfers made by BLMIS, directly or indirectly, to any Defendant.

138.    As a result of the foregoing, pursuant to section 542 of the Bankruptcy Code, the Trustee is also entitled to an accounting of all such Transfers received by any Defendant from BLMIS, directly or indirectly.

**COUNT TWO**
**PREFERENTIAL TRANSFERS - 11 U.S.C. §§ 547(b), 550, AND 551**

139.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

140.    At the time of each of the 90 Day Transfers (hereafter, the "Preference Period Transfers"), the Defendants were each a "creditor" of BLMIS within the meaning of section 101(10) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

141.    Each of the Preference Period Transfers constitutes a transfer of an interest of BLMIS in property within the meaning of section 101(54) of the Bankruptcy Code and pursuant to 15 U.S.C. § 78fff-2(c)(3).

142.    Each of the Preference Period Transfers was to or for the benefit of a Defendant.

143.    Pleading in the alternative, each of the Preference Period Transfers was made on account of an antecedent debt owed by BLMIS before such transfer was made.

144.    Each of the Preference Period Transfers were made while BLMIS was insolvent.

145.    Each of the Preference Period Transfers were made during the preference period under section 547(b)(4) of the Bankruptcy Code.

146.    Each of the Preference Period Transfers enabled Defendant to receive more than the receiving Defendant would receive if (i) this case was a case under chapter 7 of the Bankruptcy Code, (ii) the transfers had not been made, and (iii) the applicable Defendant received payment of such debt to the extent provided by the provisions of the Bankruptcy Code.

147.    Each of the Preference Period Transfers constitutes a preferential transfer avoidable by the Trustee pursuant to section 547(b) of the Bankruptcy Code and recoverable from the applicable Defendant pursuant to section 550(a).

148.    As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 547(b), 550, and 551 of the Bankruptcy Code: (a) avoiding and preserving the Preference Period Transfers, (b) directing that the Preference Period Transfers be set aside and

(c) recovering the Preference Period Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT THREE
## FRAUDULENT TRANSFERS – 11 U.S.C. §§ 548(a)(1)(A), 550, AND 551

149. To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

150. The Two Year Transfers were made on or within two years before the filing date of BLMIS' case.

151. The Two Year Transfers were made by BLMIS with the actual intent to hinder, delay, and defraud some or all of BLMIS' then existing or future creditors.

152. The Two Year Transfers constitute a fraudulent transfer avoidable by the Trustee pursuant to section 548(a)(1)(A) of the Bankruptcy Code and recoverable from the Defendants pursuant to section 550(a).

153. As a result of the foregoing, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof,  from the Defendants for the benefit of the estate of BLMIS.

## COUNT FOUR
## FRAUDULENT TRANSFER – 11 U.S.C. §§ 548(a)(1)(B) , 550, AND 551

154.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

155.    The Two Year Transfers were made on or within two years before the Filing Date.

156.    BLMIS received less than a reasonably equivalent value in exchange for each of the Two Year Transfers.

157.    At the time of each of the Two Year Transfers, BLMIS was insolvent, or became insolvent as a result of the Two Year Transfer in question.

158.    At the time of each of the Two Year Transfers, BLMIS was engaged in a business or a transaction, or was about to engage in business or a transaction, for which any property remaining with BLMIS was an unreasonably small capital.

159.    At the time of each of the Two Year Transfers, BLMIS intended to incur, or believed that it would incur, debts that would be beyond BLMIS' ability to pay as such debts matured.

160.    The Two Year Transfers constitute fraudulent transfers avoidable by the Trustee pursuant to section 548(a)(1)(B) of the Bankruptcy Code and recoverable from the Defendants pursuant to section 550(a).

161.    As a result of the foregoing, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Two

Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

**COUNT FIVE**
**FRAUDULENT TRANSFER – --NEW YORK DEBTOR AND CREDITOR LAW**
**§§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551**

162.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

163.     At all times relevant to the Six Year Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

164.     The Six Year Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.  BLMIS made the Six Year Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

165.     As a result of the foregoing, pursuant to sections 276, 276-a, 278 and/or 279 of the New York Debtor and Creditor Law sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside; (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants.

## COUNT SIX
### FRAUDULENT TRANSFER --NEW YORK DEBTOR AND CREDITOR LAW §§ 273 AND 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551 AND 1107

166.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

167.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

168.     BLMIS did not receive fair consideration for the portion of the Six Year Transfers.

169.     BLMIS was insolvent at the time it made each of the Six Year Transfers or, in the alterative, BLMIS became insolvent as a result of each of the Six Year Transfers.

170.     As a result of the foregoing, the Trustee is entitled to a judgment pursuant to sections 273, 278 and 279 of the New York Debtor and Creditor Law and sections 544(b), 550, 551 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, for the benefit of the estate of BLMIS.

## COUNT SEVEN
## FRAUDULENT TRANSFERS—NEW YORK DEBTOR AND CREDITOR LAW §§274, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A), 551, AND 1107

171.     To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

172.     At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

173.     BLMIS did not receive fair consideration for the Six Year Transfers.

174.     At the time BLMIS made each of the Six Year Transfers, BLMIS was engaged or was about to engage in a business or transaction for which the property remaining in its hands after each of the Six Year Transfers was an unreasonably small capital.

175.     As a result of the foregoing, pursuant to sections 274, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b) and 550(a) of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers , or the value thereof, from the Defendants for the benefit of the estate of BLMIS.

## COUNT EIGHT
## FRAUDULENT TRANSFERS-NEW YORK DEBTOR AND CREDITOR LAW
## §§ 275, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(A),  AND 551

176.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of the Complaint as if fully rewritten herein.

177.    At all relevant times there was and is at least one or more creditors who held and hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

178.    BLMIS did not receive fair consideration for the Six Year Transfers.

179.    At the time BLMIS made each of the Six Year Transfers, BLMIS had incurred, was intending to incur, or believed that it would incur debts beyond its ability to pay them as the debts matured.

180.    As a result of the foregoing, pursuant to sections 275, 278 and/or 279 of the New York Debtor and Creditor Law sections 544(b), 550(a), and 551 of the Bankruptcy Code, the Trustee is entitled to a judgment: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof,  from the Defendants for the benefit of the estate of BLMIS.

# COUNT NINE
## UNDISCOVERED FRAUDULENT TRANSFERS – NEW YORK CIVIL PROCEDURE LAW AND RULES 203(g) AND NEW YORK DEBTOR AND CREDITOR LAW §§ 276, 276-a, 278 AND/OR 279, AND 11 U.S.C. §§ 544, 550(a), AND 551

181.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

182.    At all times relevant to Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS;

183.    At all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable under section 502 of the Bankruptcy Code or that were and are not allowable only under section 502(e).

184.    The Transfers were made by BLMIS with the actual intent to hinder, delay, or defraud the creditors of BLMIS.   BLMIS made the Transfers to or for the benefit of the Defendants in furtherance of a fraudulent investment scheme.

185.    As a result of the foregoing, pursuant to NY CPLR 203(g) sections 276, 276-a, 278 and/or 279 of the and New York Debtor and Creditor Law sections 544(b), 550(a), and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside; (c) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, and (d) recovering attorneys' fees from the Defendants

## COUNT TEN

### RECOVERY OF SUBSEQUENT TRANSFERS - NEW YORK DEBTOR AND CREDITOR LAW § 278 AND 11 U.S.C. §§ 544, 547, 548, 550(a), AND 551

186.    To the extent applicable, the Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

187.    Each of the Transfers are avoidable sections 544, 547 and/or 548 of the Bankruptcy Code.

188.    On information and belief, some or all of the Transfers were subsequently transferred by Cohmad directly or indirectly to the Cohmad Representatives and/or other Defendants and/or their agents in the form of payment of commissions or fees (collectively, the "Subsequent Transfers").

189.    Each of the Subsequent Transfers were made directly or indirectly to the Cohmad Representatives and/or other Defendants.

190.    The Cohmad Representatives and other Defendants are immediate or mediate transferees of the Subsequent Transfers from Cohmad.

191.    As a result of the foregoing, pursuant to section 278 of the New York Debtor and Creditor Law, sections 550(a) and 551 of the Bankruptcy Code, and 15 U.S.C. § 78fff-2(c)(3), the Trustee is entitled to a judgment against the Cohmad Representatives: (a) preserving the Subsequent Transfers, (b) recovering the Subsequent Transfers, or the value thereof, from the Cohmad Representatives for the benefit of the estate of BLMIS, and (c) recovering attorneys' fees from the Cohmad Representatives.

## COUNT ELEVEN

## OBJECTION TO DEFENDANTS' SIPA CLAIM

192.     The Trustee incorporates by reference the allegations contained in the previous paragraphs of this Complaint as if fully rewritten herein.

193.     Defendants' claim (the "Claim") is not supported by the books and records of BLMIS nor the claim materials submitted by Defendants, and, therefore, should be disallowed.

194.     The Claim also should not be allowed as a general unsecured claim.  Defendants are the recipients of transfers of BLMIS' property which are recoverable under sections 547, 548 and 550 of the Bankruptcy Code, and Defendants have not returned the Transfers to the Trustee. As a result, pursuant to section 502(d) the Claim must be disallowed unless and until the Defendants return the Transfers to the Trustee.

195.     As a result of the foregoing, the Trustee is entitled to an order disallowing the Claim.

**WHEREFORE**, the Trustee respectfully requests that this Court enter judgment in favor of the Trustee and against the Defendants as follows:

i.          On the First Claim for Relief, pursuant to section 542, 550(a), and 551 of the Bankruptcy Code: (a) that the property that was the subject of the Transfers be immediately delivered and turned over to the Trustee, and (b) for an accounting by the Defendants of the property that was the subject of the Transfers or the value of such property;

ii.          On the Second Claim for Relief, pursuant to sections 547, 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Preference Period Transfers, (b)

directing that the Preference Period Transfers be set aside, and (c) recovering the Preference Period Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

iii.                     On the Third Claim for Relief, pursuant to sections 548(a)(1)(A), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof,  from the Defendants for the benefit of the estate of BLMIS;

iv.                    On the Fourth Claim for Relief, pursuant to sections 548(a)(1)(B), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Two Year Transfers, (b) directing that the Two Year Transfers be set aside, and (c) recovering the Two Year Transfers, or the value thereof,  from the Defendants for the benefit of the estate of BLMIS;

v.                      On the Fifth Claim for Relief, pursuant to sections 276, 276-a, 278 and/or 279 of the New York Debtor & Creditor Law and sections 544(b), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, [and] (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, [and (d) recovering attorneys' fees from the Defendants];

vi.                    On the Sixth Claim for Relief, pursuant to sections 273, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550, and  551 of the Bankruptcy Code: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS;

vii.        On the Seventh Claim for Relief, pursuant to sections 274, 278 and/or 279 of the New York Debtor and Creditor Law and sections 544(b), 550, 551, and 1107 of the Bankruptcy Code: (a) avoiding and preserving Six Year Fraudulent Transfer, (b) directing the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof, from the Defendants for the benefit of the state of BLMIS;

viii.        On the Eighth Claim for Relief, pursuant to New York Debtor and Creditor Law §§ 275, 278 and/or 279 and Bankruptcy Code §§ 544(b), 550, 551, and 1107: (a) avoiding and preserving the Six Year Transfers, (b) directing that the Six Year Transfers be set aside, and (c) recovering the Six Year Transfers, or the value thereof,  from the Defendants for the benefit of the estate of BLMIS;

ix.        On the Ninth Claim for Relief, pursuant to NY CPLR 203(g) and sections 276, 276-a, 278 and/or 279 of the New York Debtor & Creditor Law and section 544(b), 550(a), and 551 of the Bankruptcy Code: (a) avoiding and preserving the Transfers, (b) directing that the Transfers be set aside, [and] (c) recovering the Transfers, or the value thereof, from the Defendants for the benefit of the estate of BLMIS, [and (d) recovering attorneys' fees from the Defendants.]

x.        On the Tenth Claim for Relief, that the claim or claims of Defendants be disallowed;

xi.        On all Claims for Relief, pursuant to federal common law and N.Y. C.P.L.R. 5001, 5004 awarding the Trustee prejudgment interest from the date on which the Transfers were received;

xii.     On all Claims for Relief, establishment of a constructive trust over the proceeds of the transfers in favor of the Trustee for the benefit of BLIMS's estate;

vi.     On all Claims for Relief, assignment of Defendants' rights to seek refunds or proceeds from the government for federal, state, and local taxes paid on Fictitious Profits during the course of the scheme;

xiii.     Awarding the Trustee all applicable interest, costs, and disbursements of this action;

xiv.     Granting Plaintiff such other, further, and different relief as the Court deems just, proper, and equitable.

Dated: New York, New York
     June 22, 2009

   *s/David J. Sheehan*_____
Baker & Hostetler LLP
45 Rockefeller Plaza
New York, New York 10111
Telephone: (212) 589-4200
Facsimile: (212) 589-4201
David J. Sheehan
Email: dsheehan@bakerlaw.com
Marc E. Hirschfield
Email: mhirschfield@bakerlaw.com

Of Counsel:
John W. Moscow
Email: jmoscow@bakerlaw.com
Oren J. Warshavsky
Email: owarshavsky@bakerlaw.com

*Attorneys for Irving H. Picard, Esq.,*
*Trustee for the SIPA Liquidation of Bernard L.*
*Madoff Investment Securities LLC*

300011652