**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------------X

In re:                                                    **FOR PUBLICATION**

BERNARD L. MADOFF INVESTMENT                              SIPA LIQUIDATION
SECURITIES LLC,                                           No. 08-01789 (BRL)

               Debtor.                         (Substantively Consolidated)
-------------------------------------------------------------X
IRVING H. PICARD, as Trustee for the
Liquidation of BERNARD L. MADOFF
INVESTMENT SECURITIES LLC,
                                       Adv. Pro. No. 09-1305 (BRL)

               Plaintiff,

     v.

COHMAD SECURITIES CORPORATION, *et al.*

               Defendants.
-------------------------------------------------------------X

APPEARANCES**:**

BAKER & HOSTETLER LLP
45 Rockefeller Plaza
New York, NY 10111
Telephone:    (212) 589-4200
Facsimile:    (212) 589-4201
<u>By</u>:    David J. Sheehan
        John W. Moscow
        Marc E. Hirschfield
        Oren J. Warshavsky

*Attorneys for Plaintiff Irving H. Picard, Trustee for the Substantively Consolidated SIPA Liquidation of Bernard L. Madoff Investment Securities LLC and Bernard L. Madoff*

VINSON & ELKINS LLP
666 Fifth Avenue, 26th Floor
New York, NY 10103
Telephone:    (212) 237-0000
Facsimile:    (212) 237-0100
<u>By</u>:    Clifford Thau
        Steven Paradise
        Joseph F. Kroetsch

*Attorneys for Defendants Cohmad Securities Corporation, Maurice J. Cohn, Marcia B. Cohn, Milton S. Cohn, and Marilyn Cohn*

BUTZEL LONG, P.C.
380 Madison Avenue, 22nd Floor
New York, NY 10017
Telephone:     (212) 818-1110
Facsimile:     (212) 818-0494
<u>By</u>:     Eric B. Fisher

    -and-

SIEGEL, LIPMAN, DUNAY SHEPARD & MISKEL, LLP
5355 Town Center Road, Suite 801
Boca Raton, FL 33486
Telephone:     (561) 368-7700
Facsimile:     (561) 368-9274
<u>By</u>:     Kenneth Lipman

*Attorneys for Defendants Richard Spring, The Spring Family Trust, and The Jeanne T. Spring Trust*

COPPEL, LAUGHLIN, BLOUNT & LAVIN, LLP
Chester Professional Building
31 Fairmount Avenue, P.O. Box 455
Chester, NJ 07930
Telephone:     (908) 879-8225
Facsimile:     (908) 879-8235
<u>By</u>:     Mark A. Blount
       John J. Lavin

*Attorneys for Defendants Alvin J. Delaire, Jr. and Carole Delaire*

DROHAN LEE, LLP
489 Fifth Avenue, 14th Floor
New York, NY 10017
Telephone:     (212) 710-0004
Facsimile:     (212) 710-0003
<u>By</u>:     Vivian R. Drohan

*Attorneys for Stanley Mervin Berman, Joyce Berman, and the S & J Partnership*

RATTET, PASTERNAK & GORDON OLIVER LLP
550 Mamaroneck Avenue
Harrison, NY 10528
Telephone:     (914) 381-7400
Facsimile:     (914) 381-7406
<u>By</u>:     James B. Glucksman

*Attorneys for Defendant Jane Delaire a/k/a Jane Delaire Hackett*

HOFFINGER STERN & ROSS, LLP
150 East 58th Street – Floor 19
New York, NY 10155
Telephone:    (212) 421-4000
Facsimile:    (212) 223-3857
By:    Jack S. Hoffinger
        Fran Hoffinger

*Attorneys for Defendants Cyril Jalon, the Estate of Elena Jalon, The Joint Tenancy of Phyllis Guenzburger and Fabian Guenzburger, and The Joint Tenancy of Robert Pinchou and Fabian Guenzburger*

Edward H. Kohlschreiber
Edward H. Kohlschreiber Sr. Rev. Mgt. Trust

*Pro Se*

Before: Hon. Burton R. Lifland
            United States Bankruptcy Judge

### MEMORANDUM DECISION AND ORDER DENYING DEFENDANTS' MOTIONS TO DISMISS TRUSTEE'S COMPLAINT

**Like Icarus, were the Cohmad Defendants singed by flying too close to the sun?[1]**

Before this Court are the motions (the "Motions to Dismiss") of (1) Cohmad Securities Corporation ("Cohmad"), Maurice "Sonny" J. Cohn ("Sonny Cohn"), Marcia B. Cohn ("Marcia Cohn"), Milton S. Cohn ("Milton Cohn") and Marilyn Cohn; (2) Richard Spring, The Spring Family Trust and The Jeanne T. Spring Trust; (3) Jane M. Delaire a/k/a Jane Delaire Hackett; (4) Stanley Mervin Berman ("Berman"), Joyce Berman and the S & J Partnership; (5) Alvin "Sonny" Delaire, Jr. ("Delaire") and Carole Delaire; (6) The Joint Tenancy of Phyllis Guenzburger and Fabian Guenzburger (the "Guenzburger Tenancy") and The Joint Tenancy of Robert Pinchou and Fabian Guenzburger (the "Pinchou Tenancy," and together with the

---

[1] Icarus, a Greek mythological figure, attempted to escape imprisonment on the island of Crete by means of wings constructed from feathers and wax. Despite his father's warnings, Icarus giddily flew higher toward the bright [Madoff] sun until it ultimately melted his wings of "innocence," sending him to his fate in the sea below. *See* http://www.pantheon.org/articles/i/icarus.html (last visited Aug. 1, 2011).

Guenzburger Tenancy, the "Tenancy Defendants"); (7) Cyril Jalon ("Jalon") and the Estate of

Elena Jalon; and (8) Edward H. Kohlschreiber and Edward H. Kohlschreiber Sr. Rev. Mgt. Trust

(collectively, the "Moving Defendants")[2] seeking to dismiss the amended complaint (the

"Complaint") of Irving H. Picard, Esq. (the "Trustee" or "Plaintiff"), trustee for the substantively

consolidated Securities Investor Protection Act[3] ("SIPA") liquidation of Bernard L. Madoff

Investment Securities LLC ("BLMIS") and Bernard L. Madoff ("Madoff"), filed pursuant to

SIPA sections 78fff(b) and 78fff-2(c)(3),[4] sections 105(a), 502(d), 542, 544, 547, 548(a), 550(a)

and 551 of the Bankruptcy Code (the "Code"), various sections of New York Debtor and

Creditor Law[5] (the "NYDCL") and other applicable law for turnover and accounting,

preferences, fraudulent conveyances, damages, and objections to SIPA claims.[6]  The Motions to

Dismiss assert that the Complaint fails to state a claim upon which relief can be granted pursuant

---

[2] The following defendants have not moved to the dismiss the Complaint: Jonathan Greenberg, Morton Kurzrok, Linda Schoenheimer McCurdy, Rosalie Buccellato, Janet Jaffin individually and in her capacity as Trustee of The Janet Jaffin Dispositive Trust, Milton Cooper in his capacity as Trustee of The Janet Jaffin Dispositive Trust, and Elizabeth Moody.  Additionally, pursuant to a settlement agreement dated December 7, 2010, the Trustee agreed to withdraw all claims against Robert M. Jaffe and M/A/S Capital Corporation in exchange for $38 million.  *See* Stipulation of Dismissal With Prejudice. Dkt. No. 183.  Further, Gloria Kurzrok was dismissed without prejudice by so-ordered Stipulation dated April 12, 2010.  Dkt. No. 155.

[3] 15 U.S.C. § 78aaa *et seq.*  Hereinafter, "SIPA" shall replace "15 U.S.C." in references to sections of SIPA.

[4] A SIPA trustee's authority to utilize the Code and the NYDCL derives from SIPA sections 78fff(b) and 78fff-2(c)(3).  SIPA section 78fff(b) provides that "[t]o the extent consistent with the provisions of this chapter, a liquidation proceeding shall be conducted in accordance with, and as though it were being conducted under chapters 1, 3, and 5 and subchapters I and II of chapter 7 of Title 11." SIPA § 78fff(b).  Similarly, SIPA section 78fff-2(c)(3) allows a SIPA trustee to utilize the avoidance powers enjoyed by a bankruptcy trustee: "Whenever customer property is not sufficient to pay in full the claims set forth in subparagraphs (A) through (D) of paragraph (1), the trustee may recover any property transferred by the debtor which, except for such transfer, would have been customer property if and to the extent that such transfer is voidable or void under the provisions of Title 11."  SIPA § 78fff-2(c)(3).

[5] N.Y. Debt. & Cred. Law § 270 *et seq.* (McKinney 2001).

[6] The Trustee has voluntarily dismissed without prejudice Count One of the Complaint, which sought turnover and accounting under section 542 of the Code.  *See* Notice of Voluntary Dismissal, Dkt. No. 207.  Additionally, although the Trustee apparently seeks to recover preferences from subsequent transferees in Count Nine of the Complaint, Compl. ¶ 142 ("Of the Two Year Transfers, multiple transfers in the collective amount of at least approximately $2,047,402.09 and potentially more were made during the 90 days prior to the Filing Date . . . and are additionally recoverable under section[] 547 . . . ."), this is likely a scrivener's error, as the elements necessary to establish the avoidability of a preference under section 547 of the Code were removed from the Complaint upon amendment.

to Federal Rule of Civil Procedure ("Rule") 12(b)(6), made applicable herein by Federal Rule of Bankruptcy Procedure ("Bankruptcy Rule") 7012, and should be dismissed.

The instant adversary proceeding seeks over $245 million in connection with prepetition transfers. At the center of the Complaint's allegations is Cohmad Securities Corporation ("Cohmad"), the New York registered broker-dealer that Madoff founded with his friend and former neighbor Sonny Cohn for the purpose of recruiting investors to BLMIS. Cohmad, a compound of the names "Cohn" and "Madoff," provided a central lifeline to BLMIS by referring investors to Madoff since its inception in the mid-1980s. At the time the Madoff Ponzi scheme collapsed, approximately twenty percent of all active BLMIS accounts were referred by Cohmad. In return, the vast majority of Cohmad's total income was derived from BLMIS. The Trustee seeks to avoid and recover commissions and fees paid by BLMIS to Cohmad and its representatives, as well as fictitious profits that the Moving Defendants withdrew from their BLMIS accounts.

For the reasons set forth below and at oral argument, the Motions to Dismiss are DENIED to the extent set forth herein.

## BACKGROUND

A comprehensive discussion of the facts underlying this SIPA liquidation and Madoff's Ponzi scheme is set forth in this Court's prior decisions. *See, e.g.*, *Picard v. Merkin (In re BLMIS)*, 440 B.R. 243, 249–51 (Bankr. S.D.N.Y. 2010); *SIPC v. BLMIS (In re BLMIS)*, 424 B.R. 122, 125–32 (Bankr. S.D.N.Y. 2010).

### I.    PROCEDURAL HISTORY

On December 11, 2008 (the "Filing Date"),[7] Madoff was arrested by federal agents and

---

[7] *See* SIPA § 78*lll*(7)(B) (defining the "Filing Date").

charged with securities fraud in violation of SIPA sections 78j(b) and 78ff, and 17 C.F.R. section 240.10b-5 in the United States District Court for the Southern District of New York (the "District Court"). *United States v. Madoff*, No. 08-MJ-02735 (S.D.N.Y. filed Dec. 11, 2008). That same day, the Securities and Exchange Commission (the "SEC") filed a civil complaint in the District Court alleging, *inter alia*, that Madoff and BLMIS were operating a Ponzi scheme through BLMIS's investment advisor activities. *S.E.C. v. Madoff, et al.*, No. 08-CV-10791 (S.D.N.Y. filed Dec. 11, 2008) (the "Civil Action"). Shortly thereafter, the Securities Investor Protection Corporation ("SIPC") filed an application in the Civil Action requesting that the Plaintiff be appointed trustee for the liquidation of the business of BLMIS. On December 15, 2008, the District Court approved SIPC's application, placing BLMIS's customers under the protections of SIPA, and removed the SIPA liquidation proceeding to this Court pursuant to SIPA sections 78eee(b)(3) and (b)(4).

One year later, on December 10, 2009, the District Court denied a motion to withdraw the reference with respect to the instant proceeding and consolidate it with an enforcement action commenced by the Securities and Exchange Commission (the "SEC Action") against, in relevant part, Cohmad, Sonny Cohn, and Marcia Cohn (the "SEC Defendants"). *See Picard v. Cohmad Sec. Corp.*, Nos. 09-CIV-07275, *et al.*, 2009 WL 4729927, at *2 (S.D.N.Y. Dec. 10, 2009). The SEC Action asserted, *inter alia*, violations and aiding and abetting violations of section 10(b) of the Securities and Exchange Act of 1934 and section 17(a) of the Securities Act of 1933 (the "Securities Claims"), and aiding and abetting technical violations of section 15(b)(7) of the Securities and Exchange Act of 1934 and section 206 of the Investment Advisors Act of 1940 (the "Aiding and Abetting Claims"). Although acknowledging "there are concerns which favor withdrawal of the reference," the District Court held that separating claims against the SEC

4

Defendants alone would not reduce discovery or the possibility of inconsistent results, "[n]or would the present litigation in the District Court be simplified by the addition of bankruptcy-law claims to the federal securities law claims." *Id.* All bankruptcy law claims asserted in the instant Complaint therefore remained before this Court.

On February 2, 2010, the District Court dismissed most of the claims in the SEC Action for failure to state a claim. *See SEC v. Cohmad Sec. Corp.*, No. 09-CIV-5680, 2010 WL 363844, at *6, *7 (S.D.N.Y. Feb. 02, 2010). The Securities Claims were dismissed because the "SEC . . . failed to allege facts giving rise to a plausible inference of the [SEC Defendants'] fraudulent intent," a required element for securities fraud violations. *Id.* at *6. The District Court dismissed the Aiding and Abetting Claims, holding that the "complaint does not allege that the Cohns held themselves out as [BLMIS] registered representatives or hid their involvement from clients they solicited." *Id.*

Also before the District Court was an action commenced by several investors against Cohmad Representative Delaire, alleging that his fraudulent misstatements and omissions induced them to lose $9.6 million with BLMIS. *See Schulman v. Delaire*, No. 10-CIV-3639, 2011 WL 672002, at *1 (S.D.N.Y. Feb. 22, 2011). The District Court dismissed the Exchange Act and the Securities Act claims for failure to specify any fraudulent statements or conduct in accordance with Rule 9(b) and dismissed the common law claims for failure to establish that Delaire owed the investors a fiduciary duty. *See id.* at *2–*4.

On August 16, 2010, the Massachusetts Securities Division issued an order against Cohmad for violations of the Massachusetts Uniform Securities Act (the "Act"). *See In re Cohmad Sec. Corp.*, E-2009-0015, 2010 WL 3431832, at *17 (Mass. Sec. Div. Aug. 16, 2010). Cohmad's specific violations included "engaging in unethical or dishonest conduct or practices

in the securities business;" failure to reasonably "supervise agents, representatives or other employees to assure compliance with the Act;" and "making or causing to be made in any proceeding under the Act, any statement which is, at the time and in the light of the circumstances under which it is made[,] false or misleading in any material respect." *Id.* As a result, the Massachusetts Securities Division revoked Cohmad's Massachusetts securities registration and fined it $200,000. *Id.*

## II.   WITHDRAWALS OF FICTITIOUS PROFITS

This Complaint is one of dozens filed by the Trustee seeking the avoidance and recovery of withdrawals of nonexistent profits supposedly earned in investment advisory accounts ("IA Accounts") at BLMIS. Madoff would generate IA Account statements showing securities that either were held or had been traded, as well as the gains and losses in those accounts. None of the purported purchases of securities in the BLMIS customer accounts actually occurred, however, and the reported gains were entirely fictitious ("Fictitious Profits").

The Trustee alleges that all of the Moving Defendants held IA Accounts with BLMIS and seeks to avoid and recover their withdrawals of Fictitious Profits (the "Withdrawals" or "Withdrawals of Fictitious Profits"). These defendants include Cohmad, Sonny Cohn, and Cohmad's Financial Industry Regulatory Authority ("FINRA") registered representatives, as well as certain of their relatives. Specifically, these relatives are Sonny Cohn's wife, who is also the former Vice President and Secretary of Cohmad; Delaire's wife, sister, and father-in-law; Berman's wife; Jalon's wife's estate, of which Jalon is executor; and trusts or joint partnerships established by, or for the benefit of, Cohmad's representatives or these family members. In addition, Withdrawals of Fictitious Profits are sought from the Tenancy Defendants who exchanged transfers to or from the IA Account maintained for the Estate of Elena Jalon. The

6

Complaint states that in excess of $100 million in Fictitious Profits was collectively withdrawn by all named defendants from their respective IA Accounts.  Compl. ¶ 138.

### III.    TRANSFERS OF COMMISSIONS

While a significant portion of the fraudulent transfers identified in the Complaint represent Withdrawals of Fictitious Profits, the majority pertain to payments of BLMIS property allegedly exchanged as fees or commissions for the referral of victims to the BLMIS Ponzi scheme (the "Commissions").  Sonny Cohn and Cohmad were paid such Commissions directly by BLMIS ("Initial Transfers of Commissions").  Cohmad subsequently distributed the vast majority of the payments it received from BLMIS to Marcia Cohn, Delaire, Berman, Cyril Jalon, and Richard Spring, who are or were FINRA registered brokers employed by Cohmad (the "Cohmad Representatives"), as well as other Cohmad representatives not moving to dismiss the Complaint.  In sum, only Cohmad and Sonny Cohn allegedly received Initial Transfers of Commissions, while the Cohmad Representatives are alleged to be subsequent transferees.

Initial Transfers of Commissions paid to Cohmad were based on the net cash value of the accounts procured by the Cohmad Representatives.  To track the true cash value of the accounts referred by the Cohmad Representatives, Cohmad and BLMIS set up a cash database (the "Cohmad Cash Database").  The Cohmad Cash Database generated payment schedules detailing, among other information, the annual Commissions due to each Cohmad Representative.  If the account holder withdrew all of the funds in the account, the Cohmad Representative would no longer be entitled to receive Commissions.  Indeed, Commissions would be debited where investors withdrew more than the principal they invested.  Compl. ¶ 75.  BLMIS paid one twelfth of the total annual Commissions to Cohmad on a monthly basis as an Initial Transfer of Commissions.  Cohmad, in turn, paid these amounts to the respective Cohmad Representatives

(the "Subsequent Transfers of Commissions"). Compl. ¶ 59. The Trustee alleges that this payment structure, based on a duel bookkeeping system typical of fraudulent enterprises, indicates Cohmad's and the Cohmad Representatives' actual knowledge of fraud. Compl. ¶ 75.

### A.    Initial Transfers of Commissions to Cohmad

Cohmad was formed for the purpose of recruiting investors for Madoff and, thereby, funneling funds into BLMIS. In exchange, BLMIS would transmit money to Cohmad based upon the actual funds that Cohmad channeled to BLMIS. From January 1996 through 2008, BLMIS paid Initial Transfers of Commissions to Cohmad in an amount of approximately $98,448,678.84. Compl. ¶ 60, Ex. 2.

Just as the name Cohmad could not exist without Cohn and Madoff, Cohmad could not have existed without BLMIS. From a revenue standpoint, BLMIS's payments constituted anywhere from 75.46% to 91.19% of Cohmad's total income per year from 2000–2008. Compl. ¶ 63. In terms of physical proximity, Cohmad was a subtenant of BLMIS, sharing office space on the 18th Floor at 885 Third Avenue. As shown by the floor plan provided in Figure 11 of the Complaint, Cohmad's offices were interspersed among BLMIS's offices, with no physical indication that Cohmad's employees worked for a company other than BLMIS. Compl. ¶ 112. In addition, Cohmad's operational infrastructure was essentially provided by BLMIS. Through BLMIS, Cohmad obtained electricity, market data, exchange fees, access to BLMIS's computer network, and the use of BLMIS's administrative staff. Compl. ¶ 110. More significant assistance came in the form of payments of FICA payroll taxes and the administration of employee benefits, including dental and life insurance plans, for all Cohmad employees. Compl. ¶ 108. One Defendant, Berman, was given a retirement bonus directly from BLMIS even though he was a Cohmad employee. Compl. ¶ 109.

The Trustee asserts that a symbiotic relationship was cultivated by Cohmad's principals'

and employees' deliberate obfuscation of any perception that BLMIS and Cohmad operated as separate and distinct entities. The Complaint indicates that individuals employed as registered representatives of Cohmad held themselves out as being employed by BLMIS. Compl. ¶¶ 89–124. Various BLMIS Operating Forms listed one of the Cohmad Representatives as the applicable BLMIS-registered representative for the account, thereby indicating that the Cohmad Representatives were registered representatives at BLMIS. Cohmad's co-founder, Sonny Cohn, referred to BLMIS's investment principles and strategies as though they were his own when making representations to existing or potential investors. Compl. ¶ 104, Ex. 13. At times, the Cohmad Representatives maintained control over customer accounts after referral by withdrawing funds, transferring funds between accounts, and providing copies of account statements. Compl. ¶ 100.

Cohmad's owners and principals, namely Sonny Cohn and his daughter Marcia Cohn, had unfettered access to Madoff and BLMIS's offices. Marcia Cohn, in particular, had a BLMIS master key, which she used regularly to gain access to the 17th floor, even though her office was located on the 18th floor with the rest of the Cohmad offices. The 17th floor was where the fraudulent activity was taking place, and was "cloaked in mystery." Compl. ¶ 115. Indeed, it was kept off-limits to all but a select few BLMIS employees and family members. Moreover, the IA business on the 17th floor utilized antiquated computers, maintained handwritten logs of cash transactions before entering them manually, and equipped only six of the approximately twenty-one employees with BLMIS e-mail accounts. Compl. ¶¶ 114, 115. Marcia Cohn's key was used to access the 17th floor multiple times, including on the day of Madoff's arrest. Compl. ¶ 113, Ex. 15.

### B.    Initial Transfers of Commissions to Sonny Cohn

In addition to co-founding Cohmad, Sonny Cohn is its Chairman and Chief Executive

Officer. Compl. ¶ 12. The customer accounts he introduced to BLMIS were not reflected on the Cohmad Cash Database, nor was he subject to the same commission structure as the Cohmad Representatives. Rather, after 2002, BLMIS directly compensated Sonny Cohn for luring in new investors and channeling funds into BLMIS. In exchange for these services, BLMIS paid Sonny Cohn Initial Transfers of Commissions totaling approximately $14,601,213.15. Compl. ¶ 61, Ex. 3.

The Trustee further alleges that Sonny Cohn maintained control over the payment structure between BLMIS and Cohmad. To this end, he is alleged to have monitored the balances of customers' accounts that were referred to BLMIS by a Cohmad Representative, and to have directly received Payment Schedules from BLMIS listing the annual commissions due to each Cohmad Representative. Compl. ¶ 77, Ex. 4. These allegations, the Trustee asserts, reveal that Sonny Cohn was privy to actual negative account balances at times when the account statements reflected gains of Fictitious Profits to the account holder, and he therefore knew or should have known that Madoff was running a Ponzi scheme. The Trustee supports this conclusion by identifying BLMIS account statements provided to customers by Sonny Cohn, which show their account balances with Fictitious Profits in those accounts. Notably, these statements were printed on Cohmad letterhead. Compl. ¶ 103, Ex. 12.

### C.    Subsequent Transfers of Commissions to Cohmad Representatives

The Trustee alleges that the Initial Transfers of Commissions paid to Cohmad correlates with the sums of money that Cohmad subsequently paid to the Cohmad Representatives. Put another way, nearly all the money that Cohmad received from BLMIS was allocated by Cohmad among the Cohmad Representatives based upon the amount of cash their referrals invested with BLMIS. Compl. ¶ 59. The breakdown of the amounts owed to each Cohmad Representative is detailed in the Payment Schedules contained in Exhibit 4 to the Complaint. Compl. Ex. 4. Each

10

specifies the annual commissions that the Cohmad Representatives earned based upon the amount of money each had under management, with adjustments based on net cash activity that occurred throughout the year.  Compl. Ex. 4.

### STANDARD OF REVIEW – MOTION TO DISMISS UNDER RULE 12(b)(6)

Rule 12(b)(6) allows a party to move to dismiss a cause of action for "failure to state a claim upon which relief can be granted."  FED. R. CIV. P. 12(b)(6); FED. R. BANKR. P. 7012(b). When considering a motion to dismiss under Rule 12(b)(6), a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555–56 (2007); *EEOC v. Staten Island Sav. Bank*, 207 F.3d 144, 148 (2d Cir. 2000).

To survive a motion to dismiss, a pleading must contain a "short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2); FED. R. BANKR. P. 7008.   However, a recitation of the elements of the cause of action, supported by mere conclusory statements, is insufficient.  *Iqbal*, 129 S. Ct. at 1949 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.").  Rather, "only a complaint that states a plausible claim for relief survives a motion to dismiss."  *Id.* at 1950.  A claim is facially plausible where "the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  *Id.* at 1949.  In determining plausibility, this Court must "draw on its judicial experience and common sense," *id.* at 1950, to decide whether the factual allegations "raise a right to relief above the speculative level."  *Twombly*, 550 U.S. at 555.

11

## DISCUSSION

### I.    THE TRUSTEE HAS SUFFICIENTLY PLED ACTUAL FRAUD PURSUANT TO THE CODE AND THE NYDCL

In Counts Two and Four of the Complaint, the Trustee has alleged claims against all of the Moving Defendants to avoid and recover actual fraudulent transfers pursuant to sections 548(a)(1)(A), 544, 550(a) and 551 of the Code and sections 276, 278 and/or 279 of the NYDCL.[8] This Court finds that the Trustee has adequately alleged (1) claims to avoid Withdrawals of Fictitious Profits from all Moving Defendants;[9] and (2) claims to avoid Initial Transfers of Commissions from Sonny Cohn and Cohmad.

Actual fraudulent transfer claims brought under either section 548(a)(1)(A) of the Code or section 276 of the NYDCL must meet the heightened pleading requirements of Rule 9(b) of the Federal Rules of Civil Procedure ("Rule 9(b)"). *Am. Tissue, Inc. v. Donaldson, Lufkin & Jenrette Sec. Corp.*, 351 F. Supp. 2d 79, 106–07 (S.D.N.Y. 2004); *Andrew Velez Const., Inc. v. Consol. Edison Co. of N.Y., Inc. (In re Andrew Velez Const., Inc.)*, 373 B.R. 262, 269 (Bankr. S.D.N.Y. 2007). Namely, a trustee must: (1) "state with particularity the circumstances constituting fraud or mistake," but may plead (2) the "[m]alice, intent, knowledge, and other conditions of a person's mind" generally. FED. R. CIV. P. 9(b); FED. R. BANKR. P. 7009.

### A.    The Trustee Has Identified the Transfers with Particularity Under Rule 9(b)

Under either the Code or the NYDCL, to state an actual fraudulent transfer claim with

---

[8] Cohmad, Sonny Cohn, Marcia Cohn, Milton Cohn and Marilyn Cohn have not moved to dismiss Count Two of the Complaint for actual fraud under the Code. *See* Memorandum of Law of Defendants Cohmad Securities Corporation, Maurice J. Cohn, Marcia B. Cohn, Milton S. Cohn and Marilyn Cohn at p. 11. Dkt. No. 46 ("Cohn Mot. to Dismiss").

[9] As Cohmad and Jalon withdrew all Fictitious Profits prior to six years before the Filing Date, *see* Compl. Ex 17, the Trustee seeks to avoid and recover their Withdrawals of Fictitious Profits only under the NYDCL through the application of New York's discovery rule. *See infra* Section IV. Additionally, as the Guenzburger Tenancy's withdrawals occurred prior to the two year look-back period of the Code, the Trustee seeks to avoid and recover its Withdrawals of Fictitious Profits only under the NYDCL.

12

Rule 9(b) particularity, a party must ordinarily allege: (1) the property that was conveyed; (2) the timing and, if applicable, frequency of the transfer; and (3) the consideration paid for the transfer. *See United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 221 (S.D.N.Y. 2002). However, where the actual fraudulent transfer claim is asserted by a bankruptcy trustee, applicable Second Circuit precedent instructs courts to adopt "a more liberal view . . . since a trustee is an outsider to the transaction who must plead fraud from second-hand knowledge." *Nisselson v. Softbank AM Corp. (In re MarketXT Holdings Corp.)*, 361 B.R. 369, 395 (Bankr. S.D.N.Y. 2007) (quoting *Picard v. Taylor (In re Park South Sec., LLC)*, 326 B.R. 505, 517–18 (Bankr. S.D.N.Y. 2005)) (internal quotations omitted); *see also Shields v. Citytrust Bancorp., Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994). Moreover, in a case such as this one, where "the [T]rustee's lack of personal knowledge is compounded with complicated issues and transactions [that] extend over lengthy periods of time, the trustee's handicap increases," and "even greater latitude" should be afforded. *SIPC v. Stratton Oakmont, Inc.*, 234 B.R. 293, 310 (Bankr. S.D.N.Y. 1999).

### i.  Withdrawals of Fictitious Profits

Here, the essential facts constituting each of the Moving Defendants' Withdrawals of Fictitious Profits are readily identifiable in Exhibits 1 and 17 to the Complaint. Specifically, Exhibit 1 contains an index of the IA Accounts maintained by each of the Moving Defendants, identifying each account by name and account number. Compl. Ex. 1. Each Withdrawal of Fictitious Profits by a Defendant from his or her respective BLMIS IA Account is then identified in Exhibit 17, specifying the date, account number, transferee, transferor, method of transfer and amount transferred. Compl. Ex. 17. To illustrate, on April 10, 2008, the amount of $149,210.46 was withdrawn by Sonny Cohn by check from IA Account number 1C1296.

### ii.  Initial Transfers of Commissions

Likewise, the Initial Transfers of Commissions paid to Sonny Cohn and Cohmad are identified in Exhibits 2 and 3 to the Complaint, and total over $113 million.  Exhibit 2 lists direct payments made by BLMIS to Cohmad for the period of 1996 through 2008, totaling $98,448,678.84.  Compl. Ex. 2.  Exhibit 3 reflects direct, monthly payments—each in an amount of at least $8,000—from BLMIS to Sonny Cohn between the years 2001 and 2008, totaling approximately $14,601,213.15.  Compl. Ex. 3.

Accordingly, the facts contained in the Trustee's exhibits provide this Court with a sufficient basis to conclude that the Trustee has identified Withdrawals of Fictitious Profits and Initial Transfers of Commissions with requisite particularity.

### B.    The Trustee Has Adequately Alleged Intent Under Rule 9(b)

Given that the Trustee has identified with requisite particularity the transfers he seeks to avoid under section 548(a)(1)(A) and section 276 of the NYDCL, the next question is whether the Trustee has sufficiently pled the element of fraudulent intent pursuant to Rule 9(b).  *See* FED. R. CIV. P. 9(b); FED. R. BANKR. P. 7009 ("[M]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally.").  Pursuant to section 548(a)(1)(A) of the Code, a trustee must establish that the debtor  "made such transfer . . . with actual intent to hinder, delay, or defraud."  11 U.S.C. 548(a)(1)(A).  Likewise, under section 276 of the NYDCL, a trustee may avoid any "conveyance made . . . with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors."  NYDCL § 276.

Here, the fraudulent intent on the part of the debtor/transferor, as required under both the Code and the NYDCL, is established as a matter of law by virtue of the "Ponzi scheme presumption" as to Withdrawals of Fictitious Profits and Initial Transfers of Commissions.  *See Gowan v. The Patriot Grp., LLC (In re Dreier LLP)*  No. 09-15051, 2011 WL 2412581, *33

(Bankr. S.D.N.Y. June 16, 2011) ("Applying the Ponzi scheme presumption, the Complaint here sufficiently pleads the transferor's actual fraudulent intent [under section 276 of the NYDCL]."); *McHale v. Boulder Capital LLC (In re The 1031 Tax Grp.)*, 439 B.R. 47, 72 (Bankr. S.D.N.Y. 2010) ("If the Ponzi scheme presumption applies, actual intent for purposes of section 548(a)(1)(A) is established as a matter of law."). Under this presumption, "[a]ctual intent to hinder, delay or defraud may be established as a matter of law in cases in which the [transferor] runs a Ponzi scheme . . . because transfers made in the course of a Ponzi operation could have been made for no purpose other than to hinder, delay or defraud creditors." *Gredd v. Bear Stearns Sec. Corp. (In re Manhattan Inv. Fund Ltd.)*, 359 B.R. 510, 517–18 (Bankr. S.D.N.Y. 2007) ("*Manhattan Investment I*"), *aff'd in part and rev'd in part on other grounds*, 397 B.R. 1, 11 ("*Manhattan Investment II*") (S.D.N.Y. 2007) ("[T]he Ponzi scheme presumption remains the law of this Circuit."). As this Court has held on previous occasions, the breadth and notoriety of the Madoff Ponzi scheme leave no basis for disputing the application of the Ponzi scheme presumption to the facts of this case, particularly in light of Madoff's criminal admission. *See Chais*, 445 B.R. at 220; *Merkin*, 440 B.R. at 255; *see also Manhattan Investment II*, 397 B.R. at 12 (relying on transferor's criminal guilty plea to establish the existence of a Ponzi scheme). While it is conceivable that "certain transfers may be so unrelated to a Ponzi scheme that the presumption should not apply," the Withdrawals of Fictitious Profits "serve[d] to further [the] Ponzi scheme" and are therefore presumed fraudulent. *Manhattan Investment II*, 397 B.R. at 11. So too are the Initial Transfers of Commissions "clearly tainted as payments from a Ponzi schemer to an individual to reward them for locating new investors." *Id.* at 13.

The Moving Defendants posit that in addition to the debtor/transferor's fraudulent intent, the transferee's fraudulent intent must be established to state a claim under section 276 of the

15

NYDCL.  Although this Court previously refrained from determining this issue in the context of other actions arising out of the Madoff Ponzi scheme, *see Chais*, 445 B.R. at 221 ("Unlike under the Code, under the NYDCL, courts differ as to whether the fraudulent intent of both the transferor and the transferee must be pled."); *Merkin*, 440 B.R. at 257 (same), the analysis since provided by the court in *Dreier* convincingly demonstrates that "it is the transferor's intent alone, and not the intent of the transferee, that is relevant under NYDCL § 276," 2011 WL 2412581, at *32–33.  Indeed, the *Dreier* decision explains how the proposition that both parties' fraudulent intent must be established to state a claim for actual fraud under the NYDCL has been unwittingly transformed into an often cited, and blindly accepted, misstatement of the law.  *Id.* at *30–32.  In concurrence with the reasoning of the *Dreier* court, this Court finds that the statutory text of section 276 and its relationship to the overall framework of the NYDCL support the conclusion that only the fraudulent intent of the debtor/transferor is required to state a *prima facie* claim to avoid actual fraudulent transfers under the NYDCL.  *See id.*

For instance, section 276 provides that a trustee can avoid "[e]very conveyance made and every obligation incurred with actual intent, as distinguished from intent presumed in law, to hinder, delay, or defraud either present or future creditors . . . ."  NYDCL § 276.  This is markedly different from NYDCL section 276-a, which allows recovery of attorneys' fees "where such conveyance is found to have been made by the debtor *and received by the transferee* with actual intent."  NYDCL § 276-a (emphasis added).  Section 276 "makes no reference to the actual fraudulent intent of the transferee and the difference between the provisions cannot be ignored."  *In re Dreier LLP*, 2011 WL 2412581, at *32 (internal citations omitted).

Further support for this proposition is gleaned from section 278, which provides an affirmative defense to a bona fide purchaser for value without knowledge of the fraud to retain

the transfer. *See* NYDCL § 278(2). As an affirmative defense, section 278 requires that the transferee's intent be considered "at the summary judgment phase or at trial on a full evidentiary record." *In re Dreier LLP*, 2011 WL 2412581, at *33. Therefore, "[i]f the trustee meets the evidentiary burden of proving a prima facie case of actual fraud . . . the burden shifts to the transferee to establish the affirmative defense . . . ." *Id.* Accordingly, a defendant's good faith "need not be negated by the Trustee in the Complaint." *Id.* (quoting *Stratton Oakmont, Inc.*, 234 B.R. at 318).

Because the foregoing interpretation "aligns the fraudulent intent pleading requirement under Bankruptcy Code § 548(a)(1)(A) and NYDCL § 276," the element of fraudulent intent under both statutes is met by virtue of the Ponzi scheme presumption. *Id.* at *28. Therefore, the Moving Defendants' arguments that they accepted transfers in good faith and in exchange for value will become relevant only as affirmative defenses to be asserted at trial under section 548(c) of the Code and section 278 of the NYDCL. *See Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 659 (Bankr. E.D.N.Y. 2008) ("An innocent purchaser must affirmatively show good faith in order to take advantage of [NYDCL] section 278(2)."); *Bayou Superfund LLC v. WAM Long/Short Fund II LP (In re Bayou Grp., LLC)*, 362 B.R. 624, 631 (Bankr. S.D.N.Y. 2007) ("The good faith/value defense provided in Section 548(c) is an affirmative defense, and the burden is on the defendant-transferee to plead and establish facts to prove the defense.").

For aforementioned reasons, the Court finds the Trustee has adequately pled claims under section 548(a)(1)(A) of the Code and section 276 of the NYDCL to avoid and recover

Withdrawals of Fictitious Profits and Initial Transfers of Commissions.    Accordingly, the

Motions to Dismiss Counts Two and Four of the Complaint are denied.[10]

## II.    THE TRUSTEE HAS SUFFICIENTLY PLED CONSTRUCTIVE FRAUD PURSUANT TO THE CODE AND THE NYDCL

The Trustee has sufficiently pled Counts Three, Five, Six and Seven of the Complaint

pursuant to sections 548(a)(1)(B), 544, 550(a), and 551 of the Code and sections 273–275, 278,

and/or 279 of the NYDCL to avoid and recover transfers on the basis that they were

constructively fraudulent against (1) all of the Moving Defendants[11] with respect to Withdrawals

of Fictitious Profits; and (2) Sonny Cohn and Cohmad with respect to Initial Transfers of

Commissions.

Under both the Code and the NYDCL, courts consistently hold that "claims of

constructive fraud do not need to meet the heightened pleading requirements of Fed. R. Civ. P.

9(b)." *Bank of Commc'ns v. Ocean Dev. Am., Inc.*, No. 07-CIV-4628, 2010 WL 768881, at *6

(S.D.N.Y. Mar. 8, 2010); *Enron Corp. v. Granite Constr. Co. (In re Enron Corp.)*, No. 03–

93172, 2006 WL 2400369, at *5 (Bankr. S.D.N.Y. May 11, 2006*)* ("The Court does not see any

reason to break with its precedent in applying Rule 8(a) in evaluating the pleadings in a

constructive fraudulent conveyance matter herein."); *Stratton Oakmont, Inc.*, 234 B.R. at 319

("The pleading of constructive fraud [under the NYDCL], as opposed to actual fraud, must only

---

[10] The portion of Count Four requesting attorneys' fees pursuant to section 276-a of the NYDCL need not be stricken at this time.  While the transferee's intent is an element of a claim under section 276-a, unlike under section 276, attorneys' fees will be recoverable provided that the Trustee establishes fraudulent intent on the part of the defendants at trial.  *See In re Dreier LLP*, 2011 WL 2412581, at *33 ("If the Trustee is unable to develop through discovery evidence of actual fraud by [d]efendants, the portion of [the Complaint] requesting attorneys' fees can be dismissed before trial or following trial.").

[11] As noted previously, the Trustee seeks to avoid and recover the Withdrawals of Fictitious Profits from Cohmad and Jalon only under the NYDCL through the application of New York's discovery rule, and from the Guenzburger Tenancy only under the NYDCL.  *See supra* n.9.

comply with F.R.C.P. 8(a) . . . .").  Rather, the Trustee need only satisfy Rule 8(a) by providing a "short and plain statement of the claim showing that [he] is entitled to relief."  FED. R. CIV. P. 8(a)(2).  The purpose of this pleading requirement is to ensure that the defendant receives "fair notice of what the . . . claim is and the grounds upon which it rests."  *Scheidelman v. Henderson (In re Henderson)*, 423 B.R. 598, 612 (Bankr. N.D.N.Y. 2010) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 545 (2007)) (internal quotations omitted).  Therefore, "the sole consideration should be whether, consistent with the requirements of Rule 8(a), the complaint gives the defendant sufficient notice to prepare an answer, frame discovery and defend against the charges."  *Nisselson v. Drew Indus., Inc. (In re White Metal Rolling & Stamping Corp.)*, 222 B.R. 417, 429 (Bankr. S.D.N.Y. 1998) (internal citations omitted).[12]

### A.  The Complaint Gives the Moving Defendants Requisite Notice to Defend Against the Trustee's Constructive Fraudulent Transfer Claims Under Rule 8(a)

Section 548(a)(1)(B) of the Code requires the Trustee to show, *inter alia*, that BLMIS did not receive "reasonably equivalent value" for the transfer.  11 U.S.C. § 548(a)(1)(B).  Under sections 273–275 of NYDCL, the Trustee must show that BLMIS did not receive "fair consideration," which can be established by showing either a lack of "fair equivalent" property—

---

[12] The Court is not persuaded that the Trustee's claims to avoid Initial Transfers of Commissions against Cohmad and Sonny Cohn must be dismissed for failure to meet a heightened Rule 9(b) standard.  *See* Cohn Mot. to Dismiss at pp. 18–19 ("Because the Trustee's allegations of lack of good faith sound in fraud, they must be pleaded with particularity in accordance with Rule 9(b)'s requirements.").  Indeed, the Second Circuit has indicated that Rule 8(a) applies to constructive fraud claims even where the court considers the transferee's knowledge of the fraud and underlying actions.  *See Sharp Int'l Corp. v. State St. Bank & Trust Co. (In re Sharp Int'l Corp.)*, 403 F.3d 43, 53–54 (2d Cir. 2005) (discussing constructive fraud and raising Rule 9(b) only in subsequent discussions of actual fraud); *Silverman v. Actrade Capital, Inc. (In re Actrade Fin. Techs. Ltd.)*, 337 B.R. 791, 801 (Bankr. S.D.N.Y. 2005) ("[I]n [*Sharp*], the Second Circuit considered a motion to dismiss a complaint that asserted claims of constructive and intentional fraudulent conveyance under New York State law.  It held that the intentional fraud claims had to be pleaded in compliance with Rule 9(b) but did not imply that the constructive fraud claims had to meet any such requirement."); *see also Ecclaire Advisor Ltd. v. Daewoo Eng'g & Constr. Co.*, 375 F. Supp. 2d 237, 268 (S.D.N.Y. 2005) ("[T]his [constructive fraud claim] is not the kind of fraud to which Rule 9(b) applies.").

which is essentially reasonably equivalent value under the Code—or a lack of good faith on the part of the transferee. NYDCL § 272 (defining "fair consideration"); *In re Dreier LLP*, 2011 WL 2412581, at *39 ("To defeat a motion to dismiss, the Trustee need only allege a lack of 'fair consideration' by pleading a lack of 'fair equivalent' value *or* a lack of good faith on the part of the transferee."); *Balaber-Strauss v. Sixty-Five Brokers (In re Churchill Mortg. Inv. Corp.)*, 256 B.R. 664, 677 (Bankr. S.D.N.Y. 2000) (*Churchill I*) (" '[R]easonably equivalent value' in Section 548(a)(1)(b), [and] 'fair consideration' in the [NYDCL] . . . have the same fundamental meaning.").

### i. Withdrawals of Fictitious Profits

The Trustee has sufficiently alleged that no value was provided in exchange for the Moving Defendants' Withdrawals of Fictitious Profits. Courts have consistently held that transfers received in a Ponzi scheme in excess of an investor's principal are not transferred for reasonably equivalent value. *Sender v. Buchanan (In re Hedged-Inv. Assoc., Inc.)*, 84 F.3d 1286, 1290 (10th Cir. 1996) (holding payments in excess of original investment do not provide any value); *Scholes v. Lehmann*, 56 F.3d 750, 757 (7th Cir. 1995) ("The paying out of profits to [the defendant] not offset by further investments by him conferred no benefit on the corporations . . . ."); *In re Dreier LLP*, 2011 WL 2412581, at *37 n.44 ("The Court's conclusion that the Defendants did not provide 'reasonably equivalent value' for the payments in excess of principal is consistent with those courts that have held that investors in a Ponzi scheme are not entitled to retain the fictitious profits they received."). Thus, when investors invest in a Ponzi scheme, any payments that they receive in excess of their principal investments can be avoided by the Trustee as fraudulent transfers. *See Donell v. Kowell*, 533 F.3d 762, 770 (9th Cir. 2008) ("[T]he general rule is that to the extent innocent investors have received payments in excess of the amounts of principal that they originally invested, those payments are avoidable as fraudulent

transfers."); *In re Bayou Grp., LLC*, 439 B.R. at 338 ("Because Appellants provided no value in exchange for the fictitious profits they received, that portion of their redemption payments is voidable as a constructive fraudulent conveyance."); *Churchill I*, 256 B.R at 683 (noting the general rule that distributions in excess of principal constitute fraudulent transfers subject to avoidance).

Here, the Trustee has sufficiently pled that the Withdrawals consisted solely of Fictitious Profits, and were therefore not received in exchange for reasonably equivalent value. Compl. ¶ 138 ("Upon information and belief, Cohmad, the Cohmad Representatives and other Defendants have received in excess of $100,000,000.00 *in Fictitious Profits*.") (emphasis added). Moreover, the Complaint identifies each Withdrawal of Fictitious Profits so as to provide the Moving Defendants with fair notice of the transfers sought to be avoided. Compl. Ex. 17; *see also supra* Section I, A, i.

Accordingly, the Trustee has adequately stated a claim for constructive fraudulent transfers under the Code and the NYDCL against all Moving Defendants with regard to Withdrawals of Fictitious Profits.

## ii. Initial Transfers of Commissions

In determining whether Cohmad and Sonny Cohn conferred sufficient value in exchange for the Initial Transfers of Commissions, the Court must ultimately examine the totality of the circumstances, including "the arms-length nature of the transaction; and . . . the good faith of the transferee." *Gonzalez v. Wells Fargo Bank, N.A (In re Gonzalez)*, 342 B.R. 165, 173 (Bankr. S.D.N.Y. 2006); *see also Armstrong v. Collins*, Nos. 01-CIV-2437, *et al.*, 2010 WL 1141158, at *29 (S.D.N.Y. Mar. 24, 2010) ("In determining whether reasonably equivalent value has been provided for a transfer, courts delve beyond form to the substance of the transaction.") (internal quotations omitted); *Am. Tissue, Inc.*, 351 F. Supp. 2d at 106 (explaining that value "depends on

all the circumstances surrounding the transaction") (internal quotations omitted).   In this case, where the reasonably equivalent value analysis requires more than a simple math calculation, it is inappropriate at the motion to dismiss stage.  *See Global Crossing Estate Rep. v. Winnick*, No. 04-CIV-2558, 2006 WL 2212776, at *9 (S.D.N.Y. Aug. 03, 2006) ("[T]he question whether 'fair consideration' was received is a factual one, and thus even where on the surface it would appear that such is the case (for example, the [defendants] point out that during the period, [the debtor] managed to raise billions of dollars in capital, precisely what it had asked the [defendants] to accomplish, it would be premature to dismiss these claims."); *In re Actrade Fin. Techs. Ltd.*, 337 B.R. at 804 ("[T]he question of 'reasonably equivalent value' . . . is fact intensive, and usually cannot be determined on the pleadings.").

Cohmad and Sonny Cohn nevertheless argue, unpersuasively, that the Trustee's constructive fraudulent transfer claims fail as a matter of law because their services constituted reasonably equivalent value and fair consideration given to BLMIS.   In support of this contention, they rely principally upon the case of *In re Churchill Mortgage Inv. Corp.*, where the court found that the brokers provided value by performing their duties in exchange for the commissions received.   256 B.R. at 667, *aff'd*, *Balaber-Strauss v. Lawrence*, 264 B.R. 303 (S.D.N.Y. July 9, 2001) (*Churchill II*).[13]   Cohmad and Sonny Cohn ignore that the *Churchill* court explicitly limited its holding to undisputedly "innocent" brokers:

It is important here to note what the Trustee does *not* allege. There is no allegation

---

[13] In *Churchill*, the trustee sought to avoid commissions paid to brokers by a debtor that ran a fraudulent scheme. The Trustee's sole argument was that the brokers' services were actually detrimental to the debtor in that each investor they brought in deepened the debtor's insolvency. 256 B.R. at 680. The court rejected this argument and held that "value" is dependent upon the specific transactions at issue between the debtor and transferees, and not on the overall impact of the services on the debtor's financial condition. Finding that the brokers performed their duties as required, the court held that the commissions could not be avoided as fraudulent conveyances. *Id.* ("[T]he Brokers in these cases were hired and paid to produce mortgages or investors. They produced and thereby gave value . . . .").

in the complaints and no claim by the Trustee that the Brokers had any knowledge of the Ponzi scheme. There is no allegation in the complaints and no claim by the Trustee that any of the Brokers' activities were fraudulent, or unlawful, or wrongful in any manner.

256 B.R. at 673–74; *see also id.* at 674 ("It is also assumed that the Brokers had no knowledge of the Ponzi scheme, and that the Brokers' own activities were not unlawful or wrongful in any respect."); *id.* at 680 ("They earned what they were paid fairly and *without wrongdoing.*") (emphasis added). The issue before the court was narrowly defined as whether "[b]rokers [may] be held liable to repay commissions, which *they earned in good faith* . . . merely because the Debtors' management was *independently* engaged in a fraudulent enterprise[.]" *Id.* at 675 (emphasis added). Indeed, in affirming *Churchill*, the District Court likewise emphasized, and it was undisputed by the parties, that "[t]he Brokers in this case performed *innocent* services . . . . The Debtors received 'value' in exchange for the commissions paid to the Brokers for performing *in good faith a facially lawful and customary service* . . . ." *Churchill II*, 264 B.R. at 308 (emphasis added).

Here, unlike in *Churchill*, the Complaint alleges a lack of innocence on the parts of Sonny Cohn and Cohmad, through its officers and directors.[14] *See In re Bayou Grp., LLC*, 362 B.R. at 637 (noting bad faith investors' reliance on *Churchill* was misplaced because "[i]t was not alleged [in *Churchill*] that any of the brokers had any knowledge of the fraud perpetrated by

---

[14] The Trustee has alleged that Sonny is an owner of Cohmad and serves as the Chairman and Chief Executive Officer, and that Marcia Cohn is an owner of Cohmad and serves as President, Chief Operating Officer, and Chief Compliance Officer. Thus, Cohmad can be charged with any fraudulent knowledge attributable to Sonny and Marcia based on general principles of New York agency law. *See, e.g., Bondi v. Bank of Am. (In re Parmalat)*, 383 F. Supp. 2d 587, 597 (S.D.N.Y. 2005) ("The acts performed and knowledge acquired by a corporate officer or agent are imputed to the corporation where the officer or agent was acting within the scope of his or her employment."); *SEC v. Ballesteros Franco*, 253 F. Supp. 2d 720, 729 (S.D.N.Y. 2003) ("[A]corporation can act only through the actions of natural persons and that the actions of its agents, acting within the scope of their agency, are attributed to the corporation."). As imputation is based on basic agency principles and not corporate veil piercing, and as none of the causes of action or remedies sought in the Complaint requires that the Moving Defendants be alter egos of their associated corporations, the Court need not address the arguments of Cohmad, Sonny Cohn, and Marcia Cohn that the Trustee has inadequately alleged claims for alter ego and corporate veil piecing.

23

the Churchill entities").  According to the Complaint, the interconnection between Cohmad and BLMIS was so pervasive that they appeared to be arms of the same enterprise—the name "Cohmad" itself embodies the union between Sonny Cohn and Madoff.[15]  Cohmad and BLMIS shared office space wherein Cohmad employees worked side-by-side with BLMIS employees. Marcia Cohn even maintained a BLMIS master key that granted her access to the mysterious 17th floor, the purported nucleus of the fraud.  Exhibit 17 illustrates that Marcia Cohn utilized the BLMIS master key on numerous occasions, including on the day of Madoff's arrest.  Compl. Ex. 17.  Cohmad procured its utility services, market data and exchange fees, computer network, telephone, and other services through BLMIS.  To potential investors, Cohmad Representatives held themselves out to be representatives of Madoff and/or BLMIS, and they were often listed on BLMIS account opening forms as the BLMIS representative.  Indeed, BLMIS and Cohmad were so intertwined that many of the victims introduced to BLMIS through Cohmad had never heard of Cohmad.  Compl. ¶ 89.

Sonny Cohn, in particular, provided account statements to certain customers with BLMIS account balance information, including fictitious profits, and purported to manage the BLMIS accounts.  Compl. ¶ 103, Ex. 12.  He described Madoff's activities to customers as though they were Cohmad's, stating Cohmad manages customer accounts "using a simplistic, and most important, a very conservative strategy in a disciplined manner, always 'insuring' the accounts against major loss by using put options."  Compl. ¶ 99, Ex. 9.  In one instance, Sonny Cohn is listed as the account representative on a BLMIS account that was not even referred by a Cohmad Representative.  Compl. ¶ 97–98.  While Sonny Cohn purports to have worked for Cohmad, he

---

[15] Madoff, with the knowledge of Sonny and Marcia Cohn, allegedly utilized Cohmad to funnel money to Sonja Kohn, an individual that was not a Cohmad Representative or otherwise affiliated with Cohmad.  *See* Compl. ¶¶ 76, 120–24, Ex. 4.

did not receive commissions through Cohmad after 2002, but instead was paid directly from BLMIS.[16]

Taking these allegations as true for purposes of the Motions to Dismiss, the Court cannot conclude as a matter of law that Cohmad and Sonny Cohn provided reasonably equivalent value by "performing in good faith a facially lawful and customary service," *Churchill II*, 264 B.R. at 308, for a separate entity "independently engaged" in operating a Ponzi scheme, *Churchill I*, 256 B.R. at 675; *see also Rieser v. Hayslip (In re Canyon Sys. Corp.)*, 343 B.R. 615, 645–46 (Bankr. S.D. Ohio 2006) (holding that even under *Churchill*, brokers failed to give reasonably equivalent value where they were insiders or related to insiders of the debtor and therefore presumably familiar with the debtor's scheme). As a result, "[i]t would . . . be premature to dismiss the [fraudulent transfer] claim[s] on the ground that the value transferred to [the debtor] appears, in simple mathematical terms, to exceed that of the allegedly fraudulent transfers." *Am. Tissue, Inc.*, 351 F. Supp. 2d at 106. At this stage, the Trustee has plausibly alleged a lack of innocence sufficient to distinguish *Churchill* and raise the curtain for discovery into the value, if any, given by Cohmad and Sonny Cohn in exchange for their receipt of Commissions.

Consequently, the Trustee has adequately pled his constructive fraud claims against

---

[16] The Complaint at issue here differs from the complaint dismissed in *SEC v. Cohmad* and is substantially buttressed by law and fact. First, the legal standard applicable to the bankruptcy claims asserted in the instant Complaint is not equivalent to that of the securities law claims dismissed by the District Court. As an element of its *prima facie* case for the Securities Claims, the SEC was required to plead scienter, or fraudulent intent, on the part of the SEC Defendants. *See SEC v. Cohmad Sec. Corp.*, 2010 WL 363844, at *3. By contrast, the avoidance actions asserted in the instant Complaint do not require the Trustee to establish fraudulent intent on the part of the transferees at this stage of the proceedings. *See, e.g.*, *In re Dreier LLP*, 2011 WL 2412581, at *32; *In re Enron Corp.*, 2006 WL 2400369, at *5 (explaining that scienter is not an element of constructive fraud); *Stratton Oakmont, Inc.*, 234 B.R. at 319 (same). Second, many of the above allegations were not presented to the District Court in the SEC Action. For example, there was no mention of Marcia Cohn's unfettered access to the 17th floor, Sonny Cohn's and the Cohmad Representatives' portrayal of themselves as BLMIS employees, their continuing role in account maintenance, or the transfers to Sonja Kohn. The allegations here, which are not evaluated under the securities law standard of scienter considered in the SEC Action, are sufficient under applicable case law to raise the curtain for discovery into the Trustee's claims.

Cohmad and Sonny Cohn, and the Motions to Dismiss Counts Three, Five, Six and Seven of the Complaint are denied.

### III.    THE TRUSTEE HAS PROPERLY ALLEGED THAT THE RELEVANT DATE FOR SIX YEAR FRAUDULENT CONVEYANCES UNDER THE NYDCL IS THE FILING DATE OF THE SIPA PROCEEDING

With respect to the Trustee's fraudulent conveyance actions under the NYDCL, the Court finds that the relevant look-back period extends to those transfers made as early as December 11, 2002, six years before the December 11, 2008 Filing Date of the SIPA liquidation proceeding. *See* Compl. ¶ 8.

The Moving Defendants argue that the statute of limitations for fraudulent conveyance actions under section 213(8) of the New York Civil Procedure Law and Rules (the "NYCPLR"),[17] incorporated by reference in section 544(b) of the Code, looks back six years from the filing of the *Complaint*, filed on June 22, 2009, rather than from the *Filing Date*, December 11, 2008.   In effect, the Moving Defendants challenge the Trustee's attempts to recover those Transfers made in the period between December 11, 2002 and June 22, 2003.

The issue raised by the Moving Defendants, centering on the interplay between the state statute of limitation periods incorporated by sections 544(b) and 546(a) of the Code, has been determined by this Court as a matter of law in previous decisions.  *See, e.g.*, *Chais*, 445 B.R. at 220.  In concurrence with the weight of authority, this Court concluded that "upon the filing of a bankruptcy case, state law statutes of limitation cease to have any continued effect, and, instead, the provisions of section 546(a) of the Code govern," allowing a trustee to recover transfers made six years before the Filing Date.  *Id.* at 231.  Courts have held that as long as the statute of limitations has not expired as of the petition date, a trustee is permitted to bring New York

---

[17] Section 213(8) of the NYCPLR states, in relevant part, that the statute of limitation for bringing causes of action sounding in fraud is six years.  NYCPLR § 213(8).

fraudulent conveyance actions looking back six years from the Filing Date in accordance with

section 544(b) at *any* point during the two-year period set out in section 546(a). *See, e.g.,*

*Barnard v. Joffe (In re Inflight Newspapers, Inc.)*, 423 B.R. 6, 20 (Bankr. E.D.N.Y. 2010)

("[T]he operative date for determining the look-back period for recovering a transfer is the

*petition date*.") (emphasis added); *O'Connell v. Shallo (In re Die Fliedermaus LLC)*, 323 B.R.

101, 107 (Bankr. S.D.N.Y. 2005) ("This would permit the Trustee to reach back to October 3,

1995, *six years before the Debtor's bankruptcy petition was filed*.") (emphasis added).

Construing section 546(a) of the Code and the applicable state statute of limitation period in this

manner fosters a trustee's ability to recover property for the benefit of the estate—a

congressional goal intended to be achieved by the Code. *See Summit Sec. Inc. v. Sandifur (In re*

*Metro. Mortg. & Sec. Co., Inc.)*, 344 B.R. 138, 141 (Bankr. E.D. Wash. 2006).

Accordingly, the Trustee may avoid those transfers made as early as December 11, 2002,

six years before the December 11, 2008 Filing Date. Counts Four, Five, Six and Seven of the

Complaint seeking transfers going back six years from the Filing Date are therefore timely and

have been properly pled.[18]

## IV. THE TRUSTEE HAS SUFFICIENTLY PLED CLAIMS FOR TRANSFERS PRIOR TO SIX YEARS BEFORE THE FILING DATE BASED ON THE DISCOVERY RULE

The Trustee has sufficiently pled Count Eight of the Complaint[19] pursuant to sections

213(8) and 203(g) of the NYCPLR, sections 276, 278 and/or 279 of the NYDCL, and sections

544, 550(a) and 551 of the Code, to recover actual fraudulent transfers from the Defendants

---

[18] In addition, even if the Moving Defendants' position were correct, the Trustee may nonetheless avoid the Transfers that occurred in the disputed period between December 11, 2002 and June 22, 2003 due to New York's "discovery rule," which is discussed in detail in Section IV.

[19] Cohmad, Sonny Cohn, Marcia Cohn, Milton Cohn and Marilyn Cohn have not moved to dismiss Count Eight of the Complaint for undiscovered fraudulent transfers. *See* Cohn Mot. to Dismiss at pp. 29–31.

made more than six years before the Filing Date pursuant to New York's "discovery rule."[20]

The Trustee seeks to utilize New York's discovery rule, in conjunction with his strong arm power under section 544 of the Code and applicable sections of the NYDCL, to avoid "undiscovered transfers" that occurred more than six years before the Filing Date. To do this, the Trustee must show that during the period various transfers were made, Madoff's fraud was either: (1) not discovered, and could not have been discovered with reasonable diligence, by at least one unsecured creditor; or (2) was only discovered, and could have only been discovered with reasonable diligence, by at least one unsecured creditor within two years of the Filing Date. NYCPLR §§ 213(8), 203(g); *see also Phillips v. Levie*, 593 F.2d 459, 462 n.12 (2d Cir. 1979); *Silverman v. United Talmudical Acad. Torah Vyirah, Inc. (In re Allou Distribs., Inc.)*, 446 B.R. 32, 67 (Bankr. E.D.N.Y. 2011) ("New York state law fixes the limitations period for claims under the DCL. A claim based on actual fraud under DCL Section 276 must be brought within the later of six years from the date of the fraud or conveyance, or two years from the date that the fraud should have been discovered.").

One of the Moving Defendants argues that the Trustee lacks standing to assert this cause of action under section 544 of the Code because he has failed to identify a specific unsecured creditor who could invoke the discovery rule. *See* Memorandum of Law in Support of Motion to Dismiss Adversary Proceeding of Defendant Jane Delaire Hackett pp. 29–31. Dkt. No. 66. In *Chais*, this Court rejected a virtually identical argument on the grounds that courts in this district have held that a trustee need only identify a category of unsecured creditors to assert a claim

---

[20] The "discovery rule" contained in the NYCPLR states that for causes of action predicated on fraud, "the time within which the action must be commenced shall be the greater of six years from the date the cause of action accrued or two years from the time the plaintiff or the person under whom the plaintiff claims discovered the fraud, or could with reasonable diligence have discovered it." NYCPLR § 213(8); *see also id.* at § 203(g) ("[T]he action must be commenced within two years after such actual or imputed discovery or within the period otherwise provided, computed from the time the cause of action accrued, whichever is longer.").

under section 544(b). *See* 445 B.R. at 234; *see also Global Crossing*, 2006 WL 2212776, at *11 ("[T]here is no authority for the proposition that the Estate Representative must be more specific than to identify the category of creditors with potentially viable claims."); *In re RCM Global Long Term Cap. Apprec. Fund, Ltd.*, 200 B.R. 514, 523–24 (Bankr. S.D.N.Y. 1996) (holding that pleading the existence of an unsecured creditor with an allowable claim is sufficient to plead a claim under section 544(b)).

The Complaint sufficiently alleges the existence of a category of creditors who could invoke the discovery rule. Indeed, it states that "[a]t all times relevant to the Transfers, the fraudulent scheme perpetrated by BLMIS was not reasonably discoverable by at least one unsecured creditor of BLMIS," Compl. ¶ 185, and that "[a]t all times relevant to the Transfers, there have been one or more creditors who have held and still hold matured or unmatured unsecured claims against BLMIS that were and are allowable . . . ." Compl. ¶ 186. These allegations alone provide the Moving Defendants with sufficient notice of the existence of at least one category of creditors on whose claims the Trustee bases his standing: the clearly defrauded BLMIS customers. *See* Compl. ¶ 7 ("The Trustee seeks to set aside such transfers and preserve the property for the benefit of all of BLMIS' defrauded customers.").

Even putting that aside, Second Circuit precedent suggests that adjudicating this issue is most likely premature at the motion to dismiss stage. *See Schmidt v. McKay*, 555 F.2d 30, 37 (2d Cir. 1977) (holding that whether a plaintiff knew or could have known with reasonable diligence of fraud is a mixed question of law and fact that "ordinarily should not be disposed of by summary disposition"); *Zahn v. Yucaipa Capital Fund*, 218 B.R. 656, 673 (D.R.I. 1998) ("A probing inquiry into who the creditors are, and what claims they hold, is inappropriate [on a motion to dismiss]."); *Trepuk v. Frank*, 44 N.Y.2d 723, 725 (N.Y. 1978) ("Where it does not

conclusively appear that a plaintiff had knowledge of facts from which the fraud could reasonably be inferred, a complaint should not be dismissed on motion and the question should be left to the trier of the facts.").

On the basis of the aforementioned allegations and applicable precedent, this Court finds that the Trustee has properly alleged claims to avoid actual fraudulent transfers to the extent such claims were commenced within two years of the reasonable discovery of the fraud in accordance with the New York discovery rule, and, in any event, this issue will be more fully determined after discovery upon summary judgment or a trial on the merits.

### V.    THE TRUSTEE HAS ADEQUATELY PLED CLAIMS TO RECOVER SUBSEQUENT TRANSFERS FROM THE COHMAD REPRESENTATIVES

The Trustee has sufficiently pled Count Nine of the Complaint to recover Subsequent Transfers of Commissions from the Cohmad Representatives pursuant to sections 550(a)(2) of the Code and 278 of the NYDCL.  *See* 11 U.S.C. § 550(a)(2) ("[T]o the extent that a transfer is avoided . . . the trustee may recover . . .  the property transferred . . . from . . . any immediate or mediate transferee of such initial transferee."); NYDCL § 278 (allowing recovery from "any person"); *Farm Stores, Inc. v. Sch. Feeding Corp.*, 102 A.D. 2d 249, 255 (App. Div. 2d Dep't 1984) ("[E]ach transferee . . . is liable to the creditor to the extent of the value of the money or property he or she wrongfully received.").

The Cohmad Representatives, all apparently assuming that the Trustee seeks to avoid their Commissions as initial transferees of fraudulent transfers, argue that the Complaint does not contain factual allegations supporting their awareness of the fraud, and, pursuant to *Churchill*, their commissions are therefore not avoidable.  However, because the Trustee seeks to recover Commissions from the Cohmad Representatives as subsequent transferees, not initial transferees, the Trustee need not prove a *prima facie* case of avoidability against them.  Compl. ¶ 191. ("On

30

information and belief . . . the Commissions[] were subsequently transferred by Cohmad directly or indirectly to the Cohmad Representatives . . . in the form of payment of commissions or fees."); *see also Stratton Oakmont, Inc.*, 234 B.R. at 318 ("The Trustee need not allege that Nancy or Nadine, as [subsequent] transferees, intended to defraud Stratton . . . .").

In order to adequately state his claims against the Cohmad Representatives to recover Subsequent Transfers of Commissions under the Code or the NYDCL, the Trustee need only meet a Rule 8(a) standard. *See Stratton Oakmont, Inc.*, 234 B.R. at 317 ("[R]ecovery under § 550(a) is not subject to a particularized pleading standard . . . ."). Indeed, as one court explained, the Trustee's present burden "is not so onerous as to require dollar-for-dollar accounting of the exact funds at issue." *Silverman v. K.E.R.U. Realty Corp. (In re Allou Distribs., Inc.)*, 379 B.R. 5, 30 (Bankr. E.D.N.Y. 2007) (internal quotations omitted); *see also IBT Int'l, Inc. v. Northern (In re Int'l Admin. Servs.)*, 408 F.3d 689, 708 (11th Cir. 2005) (same). Nevertheless, to establish that the Cohmad Representatives are subsequent transferees, the Complaint must "set forth the 'necessary vital statistics—the who, when, and how much' " of the purported transfers. *In re Dreier LLP*, 2011 WL 2412608 at *10 (citing *In re Allou Distribs., Inc.*, 379 B.R. at 32); *see also Buchwald Capital Advisors LLC v. JP Morgan Chase Bank, N.A. (In re Fabrikant & Sons, Inc.)*, No. 06-12737, 2009 WL 3806683, at *16 (Bankr. S.D.N.Y. Nov. 10, 2009) (dismissing in large part the second amended complaint because "it continues to lump transfers . . . and fails to particularize the initial transfers or subsequent transfers"). At the very least, the Trustee must plead a statement of facts that "adequately apprises" the Cohmad Representatives of the Subsequent Transfers of Commissions he seeks to recover. *Stratton Oakmont, Inc.*, 234 B.R. at 317–18 (identifying the pleading requirements set forth under Rule 8(a)).

31

The information contained in the Complaint and the exhibits attached thereto provide more than enough detail to provide the Cohmad Representatives with notice of when, in what amount, with what frequency and from whom they received Subsequent Transfers of Commissions, as well as why.  As discussed previously, the Initial Transfers of Commissions from BLMIS to Cohmad are set forth with particularity in Exhibits 2 and 3 to the Complaint, specifying the dates upon which they took place.  Compl. Exs. 2, 3.  The Trustee further alleges that each one of these transfers was essentially a composite of the Subsequent Transfers of Commissions that BLMIS agreed to pay each Cohmad Representative.  As set forth in Exhibit 4, BLMIS states the separate amounts of Commissions due to each Cohmad Representative based on the monies that their respective clients invested with BLMIS.  Compl. Ex. 4.  To illustrate, for the period of January 16, 2007 to January 15, 2008, the relevant Payment Schedule reflects that BLMIS calculated Alvin J. Delaire's commissions to be $536,274.36, based upon his referrals under management in the amount of $170,504,951.62, with adjustments due to cash net activity during the period.[21]  Compl. ¶ 76, Fig. 1; Compl. Ex. 4.  In short, the Trustee alleges that the amounts of Commissions specified by BLMIS on the Payment Schedules correspond to the amounts paid by BLMIS to Cohmad and, subsequently, to the Cohmad Representatives.  Compl. ¶ 79.  These allegations apprise the Cohmad Representatives of "which transactions are claimed to be fraudulent and why, when they took place, how they were executed and by whom." *Stratton Oakmont, Inc.*, 234 B.R. at 318.

---

[21] In addition to Delaire, the Payment Schedule for 2008 specifies: (1) Cyril Jalon ("CJ") had $11,374,555.68 under management and was designated $25,777.05 after adjustments; (2) Marcia Cohn ("MBC") had $65,179,600.48 under management and was designated $180,449.73 after adjustments; and (3) Richard Spring ("RS") had $523,229,607.56 under management and was designated $1,145,763.60 after adjustments.  Compl. ¶ 76, Fig. 1; Compl. Ex. 4.  Although Berman does not appear on the 2008 Payment Schedules, he appears on various others, including the Payment Schedule for January 16, 2006 to January 15, 2007.  This Payment Schedule shows that Berman ("SB") had $548,289,502.82 under management and was designated $1,314,973.75 after adjustments.  Compl. Ex. 4.

The Cohmad Representatives' arguments that they accepted their Commissions in good faith and in exchange for value may be raised as affirmative defenses at summary judgment or trial with respect to these Subsequent Transfers of Commissions under sections 550(b)(1) of the Code and 278(2) of the NYDCL. *See Goldman v. Capital City Mortgage Corp. (In Re Nieves)*, No. 08–2160, 2011 WL 2279423, at *4 (4th Cir. June 10, 2011) ("[O]nce the plaintiff has established that a party is an immediate or mediate transferee of the initial transferee, a defendant claiming a defense to liability under § 550(b) bears the burden of proof."); *Mendelsohn v. Jacobowitz (In re Jacobs)*, 394 B.R. 646, 659 (Bankr. E.D.N.Y. 2008) ("An innocent purchaser must affirmatively show good faith in order to take advantage of [NYDCL] section 278(2)."); *In re M. Fabrikant & Sons, Inc.*, 394 B.R. at 740 n.20 ("[Section 550(b)(1) of the Code] are affirmative defenses that the transferee defendant must plead and prove.").

For these reasons, the Trustee has sufficiently pled Count Nine of the Complaint to recover Subsequent Transfers of Commissions pursuant to section 550(a)(2) of the Code and section 278 of the NYDCL.

## VI.    THE TRUSTEE HAS SUFFICIENTLY PLED A BASIS FOR DISALLOWING THE MOVING DEFENDANTS' SIPA CLAIMS

The Trustee has sufficiently pled Count Ten of the Complaint to disallow the Defendants' SIPA claims as not supported by BLMIS books and records, as well as under section 502(d) of the Code. The Trustee adequately alleges that the BLMIS books and records indicate that the transfers to the Moving Defendants, detailed in Exhibit 17 to the Complaint, included Fictitious Profits above the amount of principal invested, precluding the Moving Defendants from receiving SIPC advances and distributions from the pool of assets collected by the Trustee. Compl. ¶¶ 138, 198; *see also In re BLMIS*, 424 B.R. at 125 (defining net equity by reference to amounts invested less amounts withdrawn). In addition, the Moving Defendants are sufficiently

33

alleged to be transferees of property "recoverable under section . . . 550, . . . 544, . . . [or] 548" of the Code, express grounds for disallowance under section 502(d) of the Code. 11 U.S.C. § 502(d).   Accordingly, the Motions to Dismiss Count Ten of the Complaint are denied.[22]

### VII.    THE TENANCY DEFENDANTS' MOTION TO DISMISS FOR LACK OF PERSONAL JURISDICTION WAS PREVIOUSLY DENIED BY THIS COURT AND IS PROCEDURALLY AND SUBSTANTIVELY DEFICIENT

In their Motion to Dismiss, the Tenancy Defendants misguidedly seek to relitigate personal jurisdiction arguments that this Court previously considered, upon full briefing and oral argument, and denied by written decision dated October 26, 2009 (the "October 26, 2009 Decision").  *Picard v. Cohmad Sec. Corp., (In re BLMIS)*, 418 B.R. 75, 79–82 (Bankr. S.D.N.Y. 2009).  There, this Court found, *inter alia*, that the claims asserted by the Trustee arose out of the Tenancy Defendants' "extensive profitable contacts with the forum," including transactions they directed to and from their New York BLMIS bank accounts "for many years with regular success."  *Id.* at 81.  This ruling was not appealed.

With no change in the factual circumstances upon which this Court based its October 26, 2009 Decision, and no proper motion for reargument having been presented, the Court finds no reason to depart from its prior finding of personal jurisdiction.   Indeed, the rule authorizing motions for reargument "is strictly construed to avoid repetitive arguments on issues that the court has already fully considered."  *Family Golf Ctrs., Inc. v. Acushnet Co. (In re Randall's Island Family Golf Ctrs., Inc.)*, 290 B.R. 55, 61 (Bankr. S.D.N.Y. 2003).  Such a motion is not, as attempted here, "a vehicle for relitigating old issues, presenting the case under new theories,

---

[22] Marilyn Cohn asserts that she has not filed a SIPA claim, and the Trustee does not dispute this assertion.  Rather, the Trustee acknowledges that "Count Ten applies only to those claims that were filed."  Plaintiff's Memorandum of Law in Opposition to Defendants' Motions to Dismiss at p. 69.  Dkt. No. 135.

securing a rehearing on the merits, or otherwise taking a second bite at the apple." *Sequa Corp. v. GBJ Corp.*, 156 F. 3d. 136, 144 (2d Cir. 1998) (internal quotations and citations omitted).

Under the circumstances, the Tenancy Defendants' resurrection is a procedurally improper attempt to relitigate the Complaint's purported "continuing failure" to allege personal jurisdiction. *See* Dkt. No. 127. This Court finds no plausible explanation for the reargument other than to cause "unnecessary delay" in getting to the merits of the Trustee's claims, causing a "needless increase in the cost of litigation." FED. R. BANKR. P. 9011(b)(1); *see also* 28 U.S.C. § 1927. Accordingly, while the Court, in its discretion, declines to impose sanctions at the present time, the Tenancy Defendants' Motion to Dismiss for lack of personal jurisdiction is, once again, denied.

## **CONCLUSION**

Accepting as true the facts pled in the Complaint and drawing all inferences that may be warranted by such facts, the Trustee has pled valid *prima facie* claims against the Moving Defendants, and the Motions to Dismiss under Rule 12(b)(6) are therefore DENIED to the extent set forth herein.

**IT IS SO ORDERED**.

Dated: New York, New York
      August 1, 2011

                                      /s/ Burton R. Lifland
                                      UNITED STATES BANKRUPTCY JUDGE